1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Edward Harold Schad,               )        <u>DEATH PENALTY CASE</u>
                                         )
10               Petitioner,             )        CV-97-2577-PHX-ROS
                                         )
11        v.                             )
                                         )        **MEMORANDUM OF DECISION**
12   Dora Schriro, et al.,[1],           )        **AND ORDER**
                                         )
13               Respondents.            )
                                         )
14   ─────────────────────────────      )

15        Petitioner Edward Harold Schad filed a Petition for Writ of Habeas Corpus alleging

16   that he is imprisoned and sentenced to death in violation of the United States Constitution.

17   (Dkt. 1).[2] The Amended Petition raised twenty-eight claims, including numerous subclaims.

18   (Dkt. 27).  In an Order dated May 8, 2000, the Court found that Claims C, D, E, F, G, I (in

19   part), K, N (in part), P (in part), T, U (in part), X, Z, AA (in part), and BB were procedurally

20   barred, and that Claims S, V, W, and Y were meritless.  (Dkt. 59.)  The Court found that

21   Claims A, B, H, I (in part), J, L, M, N (in part), O, P (in part), Q, R, U (in part), and AA (in

22

23        [1]     Dora Schriro, Director of the Arizona Department of Corrections, is substituted
24   pursuant to Fed. R. Civ. P. 25(d)(1).

25        [2]     "Dkt." refers to the documents in this Court's file.  "M.E." refers to the minute
     entries of the state court; "ROA-PCR" refers to the state court record of the post-conviction
26   proceedings (CR-96-629-PC); and "RT" refers to the reporter's transcripts of Petitioner's
27   trials.  This Court received a certified copy of the state court records from the Arizona
     Supreme Court.  (<u>See</u> Dkt. 38.)

28

part) were properly exhausted, and ordered Petitioner to file a memorandum regarding the merits of those claims. (Id.) Petitioner filed a merits brief. (Dkt. 82.) Respondents filed an answering brief on the merits (Dkt. 91), and Petitioner filed a reply (Dkt. 98).

For the reasons set forth herein, the Court concludes that Petitioner is not entitled to habeas relief.

## BACKGROUND

On December 14, 1978, Petitioner was indicted for first-degree murder. (ROA-PCR 2.) The Arizona Supreme Court summarized the facts of the crime as follows:

> On August 9, 1978, a badly decomposed body of an elderly male was found approximately nine miles south of Prescott, Arizona, adjacent to a roadway pull-off on U.S. Highway 89. The body was discovered after a highway department worker had detected the odor of decaying human flesh the previous day while driving past the pull-off. Although the worker and his coworker had stopped briefly to investigate the odor on August 8, the body was not actually discovered until the next day due to the fact that it was well concealed in the brush. After the corpse was discovered, the Yavapai County Sheriff's Department and the County Medical Examiner observed a small rope tied around the victim's neck. It was later established that the cause of death was strangulation.

> Because of the advanced state of decomposition, the body was not identified until October 11, 1978, when it was established that the deceased was Lorimer "Leroy" Grove, a 74-year-old Bisbee resident. Grove had last been seen on August 1, 1978, in Bisbee, Arizona. On that morning, Grove left Bisbee driving a new Cadillac, pulling a camper-trailer. His ultimate destination was Everett, Washington, where he had intended to visit his sister.

> On August 3, 1978, a dark green Ford Fairmont was found abandoned 30 miles north of Flagstaff, Arizona, alongside U.S. Highway 89 by a Department of Public Safety Highway Patrolman. It was subsequently determined that the Fairmont had been rented by the defendant from a Ford dealership in Sandy, Utah, on December 31, 1977. Although the vehicle had been rented for the weekend, it was never returned and had been reported as stolen. The vehicle was turned over to the Coconio County Sheriff's Department and was impounded at a local towing yard. On September 12, 1978, two officers examined the vehicle in connection with an investigation of possible homicide charges against defendant. Several items belonging to the victim were found in the Fairmont, including a mirror device which was identified as being similar to one used by the deceased to hook the trailer to the automobile by himself.

> On September 3, 1978, defendant was stopped by a New York Highway Trooper, for speeding, while driving the victim's Cadillac. When the defendant could not produce a registration on the vehicle, the officer asked for an explanation. Defendant replied that it wasn't his car but that he was

delivering it for a friend to an area five or ten miles from where the officer stopped him. Asked who was [sic] the friend was, defendant said he was an elderly gentlemen by the name of Larry Grove.

Defendant was arrested in Salt Lake City, Utah, on September 8, 1978, for parole violation. Defendant had been on parole from the Utah State Penitentiary where he had been serving a sentence for second degree murder conviction. After defendant was arrested and taken into custody, the Cadillac was taken to the Salt Lake City Police Department impound lot where it was searched. Various personal items were found in the car which were identified as belonging to the victim.

State v. Schad, 129 Ariz. 557, 561-62, 633 P.2d 366, 370-71 (1981) (Schad I).

On October 5, 1979, a jury found Petitioner guilty of first-degree murder. (ROA-PCR 56). The trial court sentenced Petitioner to death. (M.E. 12/27/79). The conviction and sentence were affirmed on direct appeal. Schad I, 129 Ariz. 557, 633 P.2d 366. Petitioner unsuccessfully sought certiorari review in the United States Supreme Court. Schad v. Arizona, 455 U.S. 983 (1982). Pursuant to Rule 32 of the Arizona Rules of Criminal Procedure, Petitioner filed a petition for post-conviction relief ("PCR"), which the trial court denied. Upon petition for review, however, the Arizona Supreme Court reversed the conviction and remanded the case for a new trial. State v. Schad, 142 Ariz. 619, 691 P.2d 710 (1984) (Schad II).

Petitioner was retried, and on June 27, 1985, a jury again convicted him of first-degree murder. (ROA-PCR 196). On August 29, 1985, the trial court sentenced Petitioner to death. (M.E. 8/29/85). Petitioner appealed, and the Arizona Supreme Court affirmed his conviction. State v. Schad, 163 Ariz. 411, 423, 788 P.2d 1162, 1174 (1989) (Schad III). Petitioner sought certiorari review in the United States Supreme Court. The Supreme Court granted certiorari and affirmed Petitioner's conviction and sentence.[3] Schad v. Arizona, 501 U.S.

_____

[3] The Court granted certiorari to address two questions, both of which it answered in the negative: "whether a first-degree murder conviction under jury instructions that did not require agreement on whether the defendant was guilty of premeditated murder or felony murder is unconstitutional; and (2) whether the principle recognized in Beck v. Alabama, 447 U.S. 625 (1980), entitles a defendant to instructions on all offenses that are lesser than, and included within, a capital offense as charged." Schad v. Arizona, 501 U.S.

624, 648 (1991).  The Court also denied Petitioner's motion for rehearing.  501 U.S. 1277 (1991).

Petitioner sought post-conviction relief in the trial court by filing both a preliminary petition for post-conviction relief (ROA-PCR 245) and a supplemental statement of grounds for relief (ROA-PCR 319).  The court found most of the claims contained in both the preliminary and the supplemental PCR precluded.  (M.E. 3/27/96.)  The court reviewed the merits of the remaining claims and dismissed the petitions.  (M.E. 6/21/96.)  The court also denied Petitioner's motion for rehearing.  (M.E. 7/24/96.)  Petitioner filed a petition for review (ROA-PCR 347), which the Arizona Supreme Court denied without comment.

On December 16, 1997, Petitioner filed a Preliminary Petition for Writ of Habeas Corpus in this Court.  (Dkt. 1.)  He filed his Amended Petition on August 3, 1998.  (Dkt. 27.)

## LEGAL STANDARD FOR FEDERAL HABEAS RELIEF

Petitioner's claims are governed by the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA).  Lindh v. Murphy, 521 U.S. 320, 336 (1997).  For properly preserved claims "adjudicated on the merits" by a state court, the AEDPA established a more rigorous standard for habeas relief.  See Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (Miller-El I).  As the Supreme Court has explained, the AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam) (quoting Lindh, 521 U.S. at 333 n.7).

As set forth in 28 U.S.C. § 2254(d), the AEDPA provides two avenues of habeas relief:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

624, 627.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Williams v. Taylor, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. Id. at 365; see Musladin v. Lamarque, 427 F.3d 653, 655 (9th Cir. 2005) ("AEDPA limits the source of clearly-established federal law to Supreme Court cases"); Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. Williams, 529 U.S. at 381. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be of "persuasive value" in determining what law is clearly established and whether a state court applied that law unreasonably. Musladin, 427 F.3d at 655 (collecting cases); see Clark, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. Williams, 529 U.S. at 405-06; see Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has

observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Id. at 406; see Lambert v. Blodgett, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407. In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." Id. at 409; Visciotti, 537 U.S. at 25.

According to the "demanding but not insatiable" standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. Miller-El v. Dretke, 545 U.S. 231, ___, 125 S. Ct. 2317, 2325 (2005) (Miller-El II). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El I, 537 U.S. at 340.

In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see Rice v. Collins, 126 S. Ct. 969, 974 (2006); Miller-El II, 545 U.S. at ___ , 125 S. Ct. at 2325. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. As the Court noted in Miller-El I, "AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence. The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions." 537 U.S. at 341-

42.

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000) (Delgado II). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. Himes, 336 F.3d at 853; Pirtle, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. Pirtle, 313 F.3d at 1167 (citing Delgado II, 223 F.3d at 981-82); see also Himes, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." Pirtle, 313 F.3d at 1167; see also Menendez v. Terhune, 422 F.3d 1012, 1025-26 (9th Cir. 2005); Nulph v. Cook, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

**Claim A:**   **Petitioner's Fifth and Sixth Amendment rights were violated by the prosecution's use of the testimony of John Duncan and by the failure to disclose impeachment material.**

**Claim I:**   **The prosecution's failure to disclose impeachment materials regarding Duncan entitles Petitioner to a new trial.**

In Claim A, Petitioner alleges that prosecution witness John Duncan was acting as a police agent when he obtained incriminating statements from Petitioner. (Dkt. 82 at 7-16.) Therefore, according to Petitioner, the statements he made to Duncan were obtained in violation of his rights under the Sixth and Fourteenth Amendments. (Id.) Petitioner also claims that his Fifth Amendment rights were violated by the State's failure to disclose letters written to California authorities on Duncan's behalf by a Utah detective and the prosecutor at Petitioner's first trial. (Id. at 16-22.) Claim I alleges that the prosecutor's misconduct in failing to disclose the letters requires a new trial. (Id. at 36-38.)

1        **1.     Background.**

2        In September 1978, John Duncan and his wife were temporarily residing with Wilma

3    Ehrhardt, Petitioner's live-in girlfriend, in Sandy, Utah, a suburb of Salt lake City.  Petitioner

4    first met Duncan on the night of September 7, 1978, after Petitioner returned to Sandy

5    driving a new 1978 Cadillac.  (RT 6/21/85 at 746, 755.)  According to Duncan, Petitioner

6    told him that the Cadillac was stolen.  (Id. at 818-20, 836.)  On the morning of September 8,

7    1978, Duncan called Salt Lake City Detective Kenneth Halterman with information about

8    the stolen Cadillac.[4]  (Id. at 634, 819.)  Officers staked out the Cadillac and later that morning

9    arrested Petitioner when he entered the vehicle.[5]  (Id. at 624-28.)

10        Later that day, Ehrhardt went to the jail and retrieved Petitioner's wallet.  (Id. at 667,

11   846.)  Duncan observed that the contents of the wallet included credit cards and receipts

12   bearing the name Leroy Groves, as well as a traffic citation issued to Petitioner by a New

13   York State Trooper.  (Id. at 823-24.)  Duncan again contacted Detective Halterman and

14   turned over the materials from Petitioner's wallet.  (Id. at 640-41, 823.)

15        On September 9, 1978, Detective John Johnson interviewed Petitioner, who indicated

16   that he came into possession of the Cadillac by swapping vehicles with an elderly man in

17   Virginia.  (Id. at 682-83.)  Petitioner denied any knowledge of the stolen credit cards found

18   in his wallet.  (RT 6/21/85 at 684.)  He then invoked his Miranda rights.  (See RT 8/28/79

19   at 47.)

20        On September 11, 1978, Duncan visited Petitioner in jail.  (RT 6/21/85 at 820.)

21   According to Duncan, during their conversation Petitioner urged him to destroy the credit

22   cards and receipts and stated that he would "deny being in any area of Arizona or the State

23

24        [4]     Duncan was familiar with Detective Halterman because Halterman had arrested
25   him on a California fugitive warrant; Duncan had fought extradition and was eventually
     released by the Utah authorities.  (RT 6/21/85 at 821.)

26        [5]     In addition to being suspected of possessing a stolen vehicle, Petitioner was
27   arrested for a parole violation relating to his 1968 conviction for second-degree murder.  (RT
28   8/28/79 at 5.)

of Arizona, particularly Tempe, Arizona and Prescott, Arizona." (Id. at 825.)

At Petitioner's first trial, defense counsel sought to suppress Petitioner's statement to Duncan. The trial court held an evidentiary hearing and denied the motion. (M.E. 9/26/79.) The Arizona Supreme Court rejected Petitioner's argument that admission of the statement violated his Sixth Amendment rights, finding that "[t]he police did not direct Duncan's activities nor did they pay Duncan for the information." Shad I, 129 Ariz. at 565-66, 633 P.2d at 374-75. The court observed that "[a]lthough Duncan wanted 'some help from the police' with regard to his California parole violation, this help did not amount to more than a promise from Detective Halterman that he would write a letter to Duncan's judge in California relating Duncan's assistance in the investigation" and there "was obviously no 'quid pro quo' for Duncan's assistance." Id. The court further found that "there were no concerted actions on the part of the police aimed at priming Duncan as a witness against defendant at trial, as evidence[d] by the unwillingness of the authorities to deliberately elicit incriminating statements from defendant during the suggested jail visit." Id. The court concluded that, "Regardless of Duncan's motivations in aiding the police, we cannot say that the police 'actively entered into the picture' so as to give rise to an agency relationship." Id.

At Petitioner's second trial, Detective Halterman testified that he did not suggest the visit and that Duncan was not paid for his activities. (RT 6/21/85 at 671-72.) Defense counsel again sought to suppress Petitioner's statement to Duncan, and the court again held an evidentiary hearing. (Id. at 793-816.) Duncan testified that he had initiated contact with Detective Halterman and that the idea to speak with Petitioner was his, not Halterman's. (Id. at 807-11.) Duncan testified, however, that he believed that Halterman or another officer had made special arrangements for the visit to take place. (Id. at 803-04.) He testified that he initially chose to contact Detective Halterman because he had assisted Duncan in obtaining his release after Duncan was arrested pursuant to a fugitive warrant. Duncan also testified that, "at least 10 days after" the jail visit, Detective Halterman offered to write a letter on his behalf to a California judge. (Id. at 812.) Also testifying at the evidentiary hearing was

Lieutenant Donald Judd, of the Coconino County Sheriff's Department, who stated that in telephone conversations with Detective Halterman, Halterman had referred to Duncan as an "informant" or "confidential informant."  (Id. at 794-95.)  The trial court denied the motion to suppress.  In his ruling, the judge rejected the argument that Duncan was actually a confidential informant, observing that, "The Halterman testimony was rather clear, was extremely clear and unequivocal relative to the witness Duncan's not being, term of art, a confidential informant" and that in referring to Duncan as an informant Lieutenant Judd had simply reported the phrase used by Halterman.  (Id. at 815.)  The judge also noted that Detective Halterman's involvement in Duncan's release occurred "long before the Schad case ever came to light and that the help that, minimal as it was, that he had either offered or perhaps even given to Mr. Duncan, occurred after Duncan, except for testifying, after his information, 10 days after the Schad case was over for Duncan."  (Id.)  The judge concluded: "It's abundantly clear to the court that Mr. Duncan was not an agent of the police and was not such a person as would be used by the police and such a person as would be required to give Miranda warnings to defendants."  (Id. at 815-16.)

On direct appeal, the Arizona Supreme Court was unpersuaded by the "new evidence" presented at the second evidentiary hearing.  The court explained:

> Halterman denied suggesting a visit with the defendant.  In fact, Duncan testified it was his idea.  The record is less clear on who arranged the visit.  Duncan stated that he thought that Detective Halterman or someone from the police department arranged his visit.  Nevertheless, the evidence established that the police did not tell Duncan to visit Schad or what questions he should ask.  Furthermore, the homicide investigation had yet to focus on Schad because Detective Halterman did not learn that the owner of the Cadillac was dead until a month *after* Duncan's visit.  Finally, Duncan's release pending extradition was arranged prior to the Schad case coming to light for reasons separate and apart from Duncan's subsequent assistance in this case.
>
> It is unnecessary to review the relevant case law.  We do not find the defendant's evidence any more compelling than the last time.  The record supports the judge's ruling.  We find no error in denying the defendant's motion to suppress.

Id. (citations omitted).

**2.      Sixth Amendment violation.**

- 10 -

1

2

3     This Court must determine if, as alleged by Petitioner, the decision of the Arizona

4     Supreme Court was contrary to or involved an unreasonable application of clearly established

5     federal law.  As discussed by the Arizona Supreme Court, id. at 414, 788 P.2d at 1165, and

6     acknowledged by the parties, with respect to this aspect of Claim A applicable federal law

7     includes that set forth by the United States Supreme Court in Massiah v. United States, 377

8     U.S. 201 (1964), and Maine v. Moulton, 474 U.S. 159 (1985), which hold that once a

9     defendant's Sixth Amendment right to counsel has attached, the government is forbidden

10    from "deliberately eliciting" incriminating statements, and in United States v. Henry, 447

11    U.S. 264 (1980), which applies the principles of Massiah to information obtained by

      jailhouse informants.

12          As Respondents note, also applicable to this claim is the line of Supreme Court cases

13    establishing the principle that the Sixth Amendment "right to counsel attaches only when

14    formal judicial proceedings are initiated against an individual by way of indictment,

15    information, arraignment, or preliminary hearing."  United States v. Gouveia, 467 U.S. 180,

16    185 (1984) (citing Kirby v. Illinois, 406 U.S. 682, 688 (1972)); see Illinois v. Perkins, 496

17    U.S. 292, 299 (1990); Moran v. Burbine, 475 U.S. 412, 428-31 (1986); United States v.

18    Hayes, 231 F.3d 663, 673 n. 4 (9th Cir. 2000) (collecting cases).  This line of cases also

19    stands for the proposition that the Sixth Amendment right to counsel is "offense specific,"

20    meaning that "a defendant's statements regarding offenses for which he has not been charged

21    [a]re admissible notwithstanding the attachment of his Sixth Amendment right to counsel on

22    other charged offenses."  Texas v. Cobb, 532 U.S. 162, 168 (2001) (citing McNeil v.

23    Wisconsin, 501 U.S. 171, 175-76 (1991)); see United States v. Danielson, 325 F.3d 1054,

24    1066 (9th Cir. 2003); Clabourne v. Lewis, 64 F.3d 1373, 1378 (9th Cir. 1995).

25          Based upon these principles, it is evident that Petitioner's Sixth Amendment right to

26    counsel was not violated when Duncan spoke with him because formal proceedings against

27    Petitioner had not yet been initiated.  Petitioner was arrested on September 8, 1978, on a

28

- 11 -

parole violation and suspicion of possessing a stolen car.  The jailhouse conversation with Duncan occurred three days later.  Mr. Grove's body was identified one month later, on October 11, 1978.  Petitioner was indicted for first-degree murder on December 14, 1978.

In his reply, Petitioner argues that his right to counsel had attached because he was the "focus" of the murder investigation at the time of his conversation with Duncan.  (Dkt. 98 at 19-20.)  Even if true, this is of no significance.  As the Ninth Circuit noted, simply being the target or the focus of an investigation is not sufficient to trigger a suspect's Sixth Amendment rights:

> In sum, the Supreme Court, this court, and every other circuit to consider a similar issue has adhered to the rule that adversary judicial proceedings are initiated "by way of formal charge, preliminary hearing, indictment, information, or arraignment." This is a clean and clear rule that is easy enough to follow: Initiating any of these specific proceedings "marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." We are loath to engraft some new, pre-indictment proceeding onto the rule, thereby making it no longer clean and clear – and outside the clear boundaries the Supreme Court has established.

Hayes, 231 F.3d at 675 (quoting Kirby, 406 U.S. at 690).  Moreover, as the Supreme Court explained in Gouveia, "we have never held that the right to counsel attaches at the time of arrest."  467 U.S. at 190 (explaining that the right to counsel attaches at the initiation of adversary judicial proceedings because the Sixth Amendment right "exists to protect the accused during trial-type confrontations with the prosecutor").

The decision of the Arizona Supreme Court denying Petitioner's claim that his Sixth Amendment rights were violated by admission of Duncan's testimony was neither contrary to nor an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on this aspect of Claim A.

### 3.   **Brady** violation.

The prosecutor at Petitioner's first trial, Steven Jaynes, wrote two letters to California authorities on Duncan's behalf, one prior to Duncan's testimony and one at the end of the trial.  (Dkt. 82, Ex's 9 and 10.)  Petitioner alleges that his Fifth Amendment rights were

1    violated by the failure of Jaynes, and of the prosecutor at the second trial, Frank Dawley, to

2    disclose these letters, as well as a letter written on Duncan's behalf by Detective Halterman.[6]

3    (Id. at 16-22, 36-38.)  Respondents concede that prosecutors Jaynes and Dawley should have

4    disclose the letters, but contend that Petitioner was not prejudiced by the lack of disclosure.

5    (Dkt. 91 at 25-26; see Dkt. 98, Ex. B.)  As Petitioner notes, there is no state court decision

6    addressing this aspect of Claim A, so this Court's review of the issue is de novo.[7]

7          In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the

8    suppression by the prosecution of evidence favorable to an accused upon request violates due

9    process where the evidence is material either to guilt or punishment, irrespective of the good

10   faith or bad faith of the prosecution."  The duty to disclose includes impeachment as well as

11   exculpatory material.  United States v. Bagley, 473 U.S. 667, 676 (1985).

12         The government violates its obligation under Brady where (1) the evidence in question

13   was favorable to the accused, (2) the government willfully or inadvertently suppressed the

14   evidence, and (3) prejudice resulted from the suppression (i.e., the evidence was "material").

15   Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see Banks v. Dretke, 540 U.S. 668, 691

16   (2004); Kyles v. Whitley, 514 U.S. 419, 433 (1995).  Evidence is material for Brady purposes

17   "if there is a reasonable probability that, had the evidence been disclosed to the defense, the

18   result of the proceeding would have been different."  Kyles, 514 U.S. at 433 (quoting

19   Bagley, 473 U.S. at 682); see Banks, 540 U.S. at 699; Strickler, 527 U.S. at 280.

20         With respect to the third prong of a Brady violation, the Supreme Court has explained

21   that materiality does not require a showing that the defendant would have been acquitted had

22

23

24         [6]    Claim I, asserting prosecutorial misconduct based upon this alleged discovery

25   violation, is analytically indistinguishable from this aspect of Claim A, and the Court will
     address the claims together.

26         [7]    As noted in this Court's procedural status order (Dkt. 59 at 8), Respondents

27   conceded that Petitioner's Claim A had been properly exhausted (Dkt. 29 at 12). Claim A
     included the subclaim regarding discovery violations.  (Dkt. 27 at 46.)

28

- 13 -

the suppressed evidence been disclosed.  Id. at 434-35.  Instead, a Brady violation occurs if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Id. at 435.

In the instant case, the second prong of a Brady violation  – suppression of the letters written on Duncan's behalf – is not contested.  The Court also finds, contrary to Respondents' position, that the first prong has been satisfied.  The letters were favorable to the accused, in that they would have served as additional impeachment of Duncan's credibility.  See Bagley, 473 U.S. at 683; Barker v. Fleming, 423 F.3d 1085, 1095 (9th Cir. 2005).  The Court concludes, however, that Petitioner has not satisfied the third component of a Brady violation; he has not shown that disclosure of the letters would have "put the whole case in such a different light as to undermine confidence in the verdict."  Kyles, 514 U.S. at 435.

First, the case against Petitioner was based on circumstantial evidence linking him to Mr. Grove's murder.  This evidence was independent of Duncan's testimony about Petitioner's statements, and its validity would not have been affected by additional impeachment of Duncan's credibility.  See Willhoite v. Vasquez, 921 F.2d 247, 249 (9th Cir. 2000) (while the witness's testimony was important, there was sufficient evidence apart from it "to carry the case to the jury") (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)).  Moreover, Duncan was not the principal witness against Petitioner, nor was his testimony "the glue that held the prosecution's case together."  Horton v. Mayle, 408 F.3d 570, 579 (9th Cir. 2005) (suppressed impeachment evidence is more likely to violate Brady where a witness is central to the government's case).  In Horton, for example, the Ninth Circuit reversed the denial of a habeas petition, holding that the state had violated Brady by failing to disclose a deal which would have provided immunity for the prosecution's star witness, who testified that the petitioner had confessed to robbing and murdering a drug dealer.  Id. at 573, 579.

Also, as Respondents note, the impeachment value of the letters themselves was

1    limited because they were written at the time of Petitioner's first trial and there was no

2    evidence that Duncan was receiving benefits for his testimony at Petitioner's retrial six years

3    later.

4            Finally, Duncan's credibility was significantly impeached during his testimony at the

5    second trial.  On direct examination, Duncan acknowledged that he was presently in jail on

6    a petty theft charge and that his criminal record included a conviction for grand theft auto

7    (RT 6/21/85 at 818).  He also acknowledged that he had contacted Detective Halterman about

8    the stolen Cadillac because Halterman had treated him favorably after arresting him as a

9    fugitive.  (Id. at 821-22).  On cross-examination, defense counsel emphasized Duncan's

10   criminal record (id. at 827-31), attacked his motives for assisting Detective Halterman (id.

11   at 832, 835), and noted that Duncan received a monetary reward from the bank for turning

12   in the stolen credit cards (id. at 836-37).  Counsel also examined Duncan about the letter

13   Detective Halterman had promised to write on his behalf to the California authorities (id. at

14   837-39) and about Duncan's discussions with prosecutor Jaynes concerning the possibility

15   that Jaynes could assist him with his charges in California in return for Duncan's testimony

16   (id. at 856-57).

17           Given the nature of the impeachment to which Duncan was subjected during his

18   testimony, any additional impeachment based upon the undisclosed letters would "merely

19   duplicate the grounds for impeaching [Duncan] that were actually presented to the jury."

20   Barker, 423 F.3d at 1096.  The undisclosed information was not of a different character than

21   the evidence that was presented, and did not "provide the defense with a new and different

22   ground of impeachment."  Id. (quotation omitted); see Silva v. Brown, 416 F.3d 980, 988

23   (9th Cir. 2005) (although the witness was impeached on the grounds of his plea deal, the

24   prosecution's failure to disclose an agreement by which the witness was foreclosed from

25   seeking a psychiatric examination was material for Brady purposes); Horton, 408 F.3d at 580

26   (although witness's testimony was impeached by evidence of drug use, lying to police, and

27

28

1  assisting in the crime, withheld evidence of promised immunity was a "wholly different kind

2  of impeachment evidence").

3  Carriger v. Stewart, 132 F.3d 463 (9th Cir. 1997), relied on by Petitioner for the

4  proposition that the state violates Brady when it withholds cumulative impeachment

5  evidence, is distinguishable.  In Carriger, the state withheld the Department of Corrections

6  file of its principal witness, Dunbar, whose testimony that Carriger had confessed to the

7  murder was the centerpiece of a case with weak physical evidence.  Id. at 465-66.  Adding

8  to the significance of Dunbar's credibility was the fact that Carriger's defense was that

9  Dunbar had committed the murder.  Id. at 465.  Dunbar's file contained information revealing

10 his "long history of lying to the police and blaming his crimes on others."  Id. at 479.

11 Although the prosecution acknowledged that Dunbar was testifying under a grant of

12 immunity and had a criminal record for burglary, it repeatedly vouched for his credibility,

13 and Dunbar himself offered testimony about his nonviolent and truthful character – testimony

14 that was emphatically contradicted by the information contained in the undisclosed file.  Id.

15 at 480-81.  The Ninth Circuit rejected the argument that the undisclosed information was

16 cumulative and not material, noting that the jury had not been presented with "evidence of

17 [Dunbar's] long history of falsely blaming others for his misdeeds" or his violent tendencies.

18 Id. at 481.

19 At Petitioner's trial, by contrast, Duncan was impeached with the same category of

20 information contained in the letters the prosecutors failed to disclose.  Defense counsel

21 elicited testimony from Duncan that Detective Halterman had offered to assist him with his

22 legal situation in California (RT 6/21/85 at 832, 835) and that Duncan had sought similar aid

23 from prosecutor Jaynes (id. at 856-57).  Counsel's access to the letters themselves would not

24 have substantially altered the quality of the impeachment to which Duncan was subjected,

25 nor would the additional impeachment evidence afforded by the letters have "put the whole

26 case in . . . a different light."  Kyles, 514 U.S. at 435.  Accordingly, Petitioner is not entitled

27

28

to relief on his claim that his due process rights under <u>Brady</u> were violated by the prosecution's failure to disclose the letters written on Duncan's behalf.

For the reasons set forth above, Petitioner is not entitled to habeas relief on Claim A or Claim I.

**Claim B:    The prosecution failed to preserve potentially exculpatory evidence in violation of Petitioner's right to due process.**

Petitioner alleges that the state violated his due process right to a fair trial by failing to preserve and process various items of physical evidence found in the Ford and Cadillac and by failing to preserve items found near Mr. Grove's body.[8]  (Dkt. 82 at 24-30.) Petitioner argues that as a result of the state's failure to conduct a competent and complete homicide investigation, he was denied access to "potentially exculpatory evidence." (<u>Id.</u> at 30.)  According to Petitioner, the prejudicial effect of these investigative shortcomings was particularly egregious because the evidence against him was entirely circumstantial. (<u>Id.</u> at 22-24, 29).

### 1.    State court ruling.

Prior to trial, defense counsel moved to dismiss the charges based upon the destruction of evidence. (ROA-PCR 168.)  The trial court denied the motion.  (M.E. 6/14/85.)  However, the court agreed to provide, over the State's objection, a so-called

---

[8]    Petitioner alleges that in the following instances evidence was not properly processed or preserved. (Dkt. 82 at 23-28.)  Neither the Ford driven by Petitioner nor Mr. Grove's Cadillac was searched for trace evidence, such as soil samples, hairs, and fibers. Items found in the Ford, including women's clothing, cigarettes, and a pipe containing marijuana, were not processed or preserved, and the mirror device discovered in the vehicle's trunk was not fingerprinted.  Beer cans and a V.A. card found at the pullover below which Mr. Grove's body was located were not fingerprinted or preserved.  No hair samples or fingernail scrapings were taken from Mr. Grove's body; no soil or fiber samples were taken from his clothes, and the clothing itself was destroyed.  A set of keys found on Mr. Grove was returned to his estate.  By the time of the second trial, items that had not been lost or destroyed – including, most significantly, the mirror – were no longer capable of rendering recoverable fingerprints.

1   <u>Willits</u> instruction.[9]  (RT 6/27/85 at 1341.)

2           On direct appeal, the Arizona Supreme Court rejected Petitioner's argument that the

3   state's failure to process and preserve evidence constituted a violation of his right to a fair

4   trial.  <u>Schad III</u>, 163 Ariz. at 415-16, 788 P.2d at1166-67.  In its analysis, the court first cited

5   <u>California v. Trombetta</u>, 467 U.S. 479 (1984), for the proposition that the state has a duty to

6   preserve evidence material to a suspect's defense.  <u>Id.</u>  The court next explained that "a

7   <u>Willits</u> instruction adequately protects a defendant's due process rights where the state has

8   destroyed or failed to preserve evidence unless the defendant is prejudiced *or the state acted*

9   *in bad faith*."  <u>Id.</u> at 416, 788 P.2d at 1167 (emphasis added).  Finally, the court held that the

10  <u>Willits</u> instruction given by the trial court "adequately protected the defendant's rights."  <u>Id.</u>

11  The court contrasted Petitioner's trial with cases in which the destroyed items were the only

12  evidence linking the defendant to the crime.  <u>Id.</u>  The court concluded by observing that

13  Petitioner was not prejudiced by the destruction of evidence:

14          [I]n the present case, the best that the defendant could hope for is that none of
            his fingerprints were on the mirror, clothing or other items.  While this would
15          have excluded the defendant from the set of persons whose prints were on
            these items, it would not have excluded the defendant from ever having
16          handled any of these objects, nor would it have exonerated him of the alleged
            crime.  The <u>Willits</u> instruction accomplished the most that the defendant could
17          have proved – that his prints were not on these items.  We find that the
            defendant's rights were adequately protected.
18

19  <u>Id.</u>

20          **2.    Analysis.**

21          The Due Process Clause of the Fourteenth Amendment imposes a duty on the state

22  to preserve evidence that "might be expected to play a significant role in the suspect's

23  defense."  <u>Trombetta</u>, 467 U.S. at 488.  Under the <u>Trombetta</u> standard, "evidence must both

24  _____

25          [9]      Pursuant to the holding in <u>State v. Willits</u>, 96 Ariz. 184, 393 P.2d 274 (1964),
    the trial court instructed the jury as follows: "If you find that the plaintiff, in this case the
26  State of Arizona, has destroyed, caused to be destroyed or allowed to be destroyed any
    evidence whose contents or quality are in issue, you may infer that the true fact is against
27  their interest."  (RT 6/27/85 at 1402.)

28

possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489.  To establish a due process violation when the government fails to preserve evidence that is only potentially exculpatory, the petitioner must demonstrate that the government acted in bad faith. Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988).

Contrary to Petitioner's argument, the evidence at issue does not meet the Trombetta standard of possessing an "exculpatory value that was apparent before it was destroyed." 467 U.S. at 489.  While a number of the items were of evidentiary interest, there is no indication that they possessed exculpatory value or that such value was apparent before the items were destroyed. See Youngblood, 488 U.S. at 56, n* (in child molestation case, the possibility that destroyed semen samples could have proved exculpatory "is not enough to satisfy the standard of materiality in Trombetta").  The presence, let alone the exculpatory value, of fingerprints on beer cans found at a heavily used pullover near Mr. Grove's body or on a device belonging to Mr. Grove but discovered in the locked trunk of a car used by Petitioner, or trace evidence on Mr. Grove's heavily deteriorated shirt, is a matter of pure speculation.  Because such evidence clearly falls into the "potentially useful" category, the Youngblood standard applies, and Petitioner has the burden to "show bad faith on the part of the police." Id. at 58; see Mitchell v. Goldsmith, 878 F.2d 319, 322 (9th Cir. 1989) (failure to preserve evidence of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant, is not a denial of due process unless a criminal defendant can show bad faith).

As noted above, the Arizona Supreme Court held that the Willits instruction given by the trial court was adequate to vindicate Petitioner's right to a fair trial under Trombetta. Schad III, 163 Ariz. at 416, 788 P.2d at 1167.  Implicit in that holding was a determination that the state did not act in bad faith. Id.  This Court must determine whether that holding

1    involved an unreasonable application of clearly established federal law.

2          Petitioner's only argument in support of his claim that the police acted in bad faith is

3    his characterization of the investigation as substandard for a homicide case.  (Dkt. 82 at 28-

4    29.)  This characterization, if accurate, shows at most negligence, as opposed to bad faith,

5    on the part on the investigators.  Youngblood, 488 U.S. at 58; see Villafuerte v. Stewart, 111

6    F.3d 616, 625-26 (9th Cir. 1997) (per curiam) (officers' failure to test for fingerprints in

7    certain areas and failure to perform tests on semen samples did not demonstrate bad faith).

8    In addition, as the court noted in Villafuerte, the police do not have a "constitutional duty to

9    perfrom all tests desired" by a suspect.  111 F.3d at 625 (citing Youngblood, 488 U.S. at 59).

10         Petitioner has not shown, or even alleged, that the police acted with "animus" or

11   engaged in "a conscious effort to suppress exculpatory evidence."  Trombetta, 467 U.S. at

12   488.  The investigators' conduct bears no relationship, for example, to that described in

13   Miller v. Vasquez, 868 F.2d 1116 (9th Cir. 1989).  In Miller, the Ninth Circuit reversed the

14   district court's denial of a habeas petition.  The court found that the petitioner had presented

15   a colorable claim that the investigating officer acted in bad faith when he failed to collect the

16   rape victim's blood-stained jacket and failed to photograph scratches on the petitioner's arms.

17   Id. at 1121. The record contained evidence that the officer acted in bad faith: he referred to

18   the petitioner using "an extremely derogative expletive," lied about his knowledge of the

19   bloody jacket, and tried to dissuade witnesses from testifying in the defendant's favor.  Id.

20   The Circuit remanded the matter to the district court for a determination of the petitioner's

21   bad faith claim.  Id.

22         By contrast, Petitioner here has failed to make any showing that the officers

23   conducting the investigation acted in bad faith when they failed to perform certain tests or

24   destroyed items of evidence.  See  Gausvick v. Perez, 345 F.3d 813, 817 (9th Cir. 2003) (to

25   demonstrate bad faith defendant must "put forward specific, nonconclusory allegations that

26   establish improper motive").  Petitioner has failed to meet his burden under Youngblood.

27         The Arizona Supreme Court's finding that the police did not act in bad faith, and

28

- 20 -

1
2
3

consequently that Petitioner's right to a fair trial was not violated, was not an unreasonable application of clearly established federal law as set forth in <u>Trombetta</u> and <u>Youngblood</u>. Petitioner is not entitled to relief on Claim B.

4
5

The Court further finds that Petitioner has failed to allege a colorable claim of bad faith sufficient to warrant an evidentiary hearing.  <u>See</u> <u>Miller</u>, 868 F.2d at 1121.

6
7

**Claim H:        The evidence produced at trial was not sufficient to sustain Petitioner's conviction.**

8
9
10
11
12
13
14

Petitioner contends that there was insufficient evidence to support his murder conviction.  (Dkt. 82 at 30-36.)  Petitioner argues that the State's case "was based on inferences drawn from circumstantial evidence" and that "no circumstantial evidence connected [Petitioner] to Mr. Grove's death."  (<u>Id.</u> at 30.)  Petitioner raised this claim in his preliminary PCR petition.  (ROA-PCR 245 at 8-9.)  The PCR court denied the claim as procedurally precluded.[10]  (M.E. 3/27/96.)  Because the state court did not address the merits of the claim, a de novo review is required.  <u>Pirtle v. Morgan</u>, 313 F.3d at 1167.

15
16
17
18
19
20
21
22

There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original).  In making such a determination, a reviewing court is guided by a number of principles which reflect the doctrine that "deference [is] owed to the trier of fact."  <u>Wright v. West</u>, 505 U.S. 277, 296 (1992).  For example, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any

23
24
25
26
27

        [10]        In its procedural status order of May 8, 2000, this Court found, with respect to Claims H, I (in part), N, O, P, and R, that the trial court's PCR order was based upon a finding that the claims were precluded pursuant to Rule 32.2(a)(2) of the Arizona Rules of Criminal Procedure, which precludes relief for claims that have been finally adjudicated on the merits on appeal or in collateral proceedings. (Dkt. 59 at 10.)  Because claims precluded pursuant to this subsection have been properly exhausted, the Court decided that it would review the claims on the merits.  (<u>Id.</u>)

28

- 21 -

such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. In addition, it is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319; see Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). As the Ninth Circuit has explained, "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991) (citing Jackson, 443 U.S. at 326).

While "mere suspicion or speculation cannot be the basis for creation of logical inferences . . . [c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." United States v. Lewis, 787 F.2d 1318, 1323 (9th Cir. 1986); see United States v. Johnson, 804 F.2d 1078, 1083 (9th Cir. 1986) (the government is entitled to all reasonable inferences that may be drawn from the evidence). Moreover, "the government's evidence need not exclude every reasonable hypothesis consistent with innocence." United States v. Talbert, 710 F.2d 528, 530 (9th Cir. 1983) (per curiam); see United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) ("The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict"); see Wright, 505 U.S. at 296-97; Jackson, 443 U.S. at 326.

The Court has reviewed the evidence presented at trial and concludes that it was sufficient to support Petitioner's convictions. As viewed in the light most favorable to the state, the following facts support Petitioner's murder conviction.

Leroy Grove, age 74, was last seen alive on August 1, 1978, in Bisbee, Arizona, as he was leaving on a trip to Washington state to visit his sister. (See RT 6/19/85 at 340; RT 6/20/85 at 565-70.) The next day, August 2, 1978, Petitioner was driving Mr. Grove's Cadillac and using Mr. Grove's credit card to purchase gasoline in Benson, Arizona. (RT 6/25/85 at 924.) On August 3, 1978, Petitioner purchased gas with Mr. Grove's credit card

- 22 -

1   at a station in New Mexico.  (Id. at 923.)

2           Also on August 3, 1978, a Highway trooper discovered an abandoned vehicle, a Ford

3   Fairmont, hidden behind some trees off of Highway 89, twenty miles north of Flagstaff,

4   Arizona. (RT 6/20/95 at 454-55.)  The Fairmont had been rented by Petitioner on December

5   31, 1977, from a dealership in Sandy, Utah, and was never returned.  (RT 6/20/85 at 414-16.)

6   The vehicle contained items belonging to the children of Petitioner's live-in girlfriend,

7   Wilma Erhardt. (RT 6/21/85 at 784.)  The vehicle also contained newspapers from Phoenix

8   and Mesa dated July 31 and August 1, 1978, indicating that it had not been abandoned prior

9   to the date on which Mr. Grove began his travels.  (RT 6/25/85 at 971-72.)  In the locked

10  trunk of the vehicle officers located a mirror designed by and belonging to Mr. Grove.  (See

11  RT 6/19/85 at 342-43; 6/20/95 at 443-44, 495-96, 573; 6/25/85 at 889.)  Petitioner had

12  removed the Ford's dealer plates and replaced them with Utah plates from Erhardt's vehicle.

13  (RT 6/21/85 at 784-85.)  The Utah plates were later found in the trunk of Mr. Grove's

14  Cadillac.  (RT 6/25/85 at 963.)

15          On August 8, 1978, a highway worker detected an odor of decomposition emanating

16  from the area of a roadside pullover on Highway 89 approximately eleven or twelve miles

17  south of Prescott. (RT 6/19/85 at 287-88.)  The worker discovered Mr. Grove's corpse the

18  next day.  (Id.)  It was located beneath some brush on an embankment approximately fifteen

19  feet below the edge of the pullover.  (Id. at 302; RT 6/25/85 at 958-59.)  The hands were at

20  the side of the body and the feet were crossed.  (RT 6/20/85 at 382.)  A ligature measuring

21  ten and one half inches had been tied around the neck; the circumference of the average male

22  neck is at least fourteen inches.  (Id. at 373.)  Mr. Grove had been strangled to death; the

23  hyoid bone in his neck was fractured.  (RT 6/19/85 at 361-62.)  The cause of death was

24  homicide. (Id. at 363.)  The state of decomposition indicated that the body had been there

25  for at least four days and possibly as long as a week.  (RT 6/20/85 at 375.)

26          On September 3, 1978, Petitioner was stopped for speeding by a trooper in upstate

27

28
                                        - 23 -

New York; he was driving Mr. Grove's Cadillac. (RT 6/20/85 at 551-56.) Petitioner told the trooper that he was driving the Cadillac on behalf of his friend Mr. Grove, an elderly man who was too old to travel; he was taking the car to Bridgeport, New York, where he would meet Mr. Groves. (Id. at 553.) On September 8, 1978, Petitioner was arrested in Salt Lake City, Utah, again driving Mr. Grove's Cadillac. This time, he explained to authorities that he had obtained the vehicle in a trade with an elderly man in Norfolk, Virginia. (RT 6/21/85 at 682-83.) Prior to his arrest, he offered a third version of how he had come into possession of the Cadillac, telling Erhardt that he had obtained the vehicle through a trade with an old man in Columbus, Ohio.[11] (Id. at 786-87.)

    As previously discussed, after his arrest Petitioner spoke with John Duncan. He indicated to Duncan that he would deny to the authorities that he had been in Tempe or Prescott. (Id. at 825.) He also asked Duncan to destroy the credit card evidence. (Id.)

    From August 2, 1978, to the time of his arrest, Petitioner used Mr. Grove's credit cards as he traveled throughout the United States, making fraudulent purchases at locations in twenty-eight states. (RT 6/25/85 at 976.) He also forged a check to himself on Mr. Grove's account and cashed it in Des Moines, Iowa, on August 7, 1978. Along with the credit cards, when Petitioner returned to Utah he was in possession of a ring owned by Mr. Grove. (See RT 6/21/85 at 643; RT 6/25/85 at 964-65.)

    Although Petitioner changed the license plates on the Ford Fairmont to prevent it from being traced as a stolen vehicle, he left the original plates on the Cadillac as he drove it throughout the country for more than a month. (See RT 6/21/85 at 624, 6/25/85 at 925.) This circumstance suggested that Petitioner was not concerned that the vehicle's owner

---

    [11]    At his first trial, Petitioner testified that he had obtained the Cadillac on August 2, 1978, in a trade with a French couple at a Phoenix truck stop. (RT 10/4/79 at 17-40.) According to Petitioner, the deal was brokered by a fellow inmate who had escaped from the Utah penitentiary and was working at an amusement park. (Id.) Petitioner did not testify at his retrial.

1    would report it as stolen.

2         In challenging the quality of the evidence upon which his conviction was based,

3    Petitioner theorizes that Mr. Grove was murdered by one of a number of alternative suspects,

4    or that he strangled himself to death.  Such speculation is unsupported by the trial record.

5    It is also insufficient to merit relief under <u>Jackson</u>.  As the Ninth Circuit has explained,

6    pursuant to <u>Jackson</u>, "[t]he existence of some small doubt based on an unsupported yet

7    unrebutted hypothesis of innocence is not sufficient to invalidate an otherwise legitimate

8    conviction."  <u>Taylor v. Stainer</u>, 31 F.3d 907, 910 (9th Cir. 1994).

9         Based upon the information presented at trial, a rational juror could have found proof

10   of Petitioner's guilt beyond a reasonable doubt.[12]  Therefore, Petitioner is not entitled to relief

11   on Claim H.

12

13

_____

14       [12]    In <u>Schad I</u>, the Arizona Supreme Court reached the same conclusion. 129 Ariz.

15   at 572, 633 P.2d at 381.  Citing <u>Jackson</u>, the court rejected Petitioner's argument that his
     conviction should be overturned for lack of evidence:

16

17            After reviewing the entire record, we are of the opinion that there was
              sufficient evidence from which a rational trier of fact could have found guilt

18            beyond a reasonable doubt. Without recounting every incriminating fact which
              would support the conviction, we observe that defendant gave numerous

19            contradictory versions as to how he came into possession of the victim's
              Cadillac; denied using the victim's credit cards, and stated he had never been

20            in Arizona until he discovered that the authorities could place him there on
              several occasions; personal effects belonging to the victim were found in the

21            Ford Fairmont; a diamond ring belonging to the victim was found on Wilma
              [Erhardt's] finger; although defendant professed to have never met Larry

22            Grove, he apparently knew that the victim was an elderly man when stopped
              by the New York State Trooper; defendant testified that several items of

23            personal property found in the Cadillac were his, although other witnesses
              testified that they belonged to the victim. Based upon these facts and other

24            evidence presented by the State, we cannot say that the jury was unjustified in
              disbelieving defendant's version of how he acquired the Cadillac. We find no

25            error

26   <u>Id.</u>

27

28                                         - 25 -

1   **Claim J:        Ineffective assistance of counsel – guilt phase.**

2          Petitioner alleges that trial counsel was ineffective in two ways: (1) his failure to

3   locate Mr. Duncan's wife, and (2) his failure to convince the court to admit evidence of the

4   victim's mental health.  (Dkt. 82 at 38.)  Petitioner raised these claims in his supplemental

5   PCR petition (ROA-PCR 319), and the court rejected them (M.E. 6/21/96 at 1-2).

6          As previously discussed, when a state court has addressed the merits of a petitioner's

7   claim of federal constitutional error, a federal court may grant habeas relief only if the state

8   court's decision was "contrary to, or involved an unreasonable application of, clearly

9   established Federal law, as determined by the Supreme Court of the United States."  28

10  U.S.C. § 2254(d)(1); see Yarborough v. Gentry, 540 U.S. 1, 4 (2003) (per curiam); Woodford

11  v. Visciotti, 537 U.S. at 21.  For a claim alleging ineffective assistance of counsel ("IAC"),

12  the applicable law is set forth by the Supreme Court in Strickland v. Washington, 466 U.S.

13  668 (1984).

14         To prevail under Strickland, a petitioner must show that counsel's representation fell

15  below an objective standard of reasonableness and that the deficiency prejudiced the defense.

16  466 U.S. at 687-88.  The inquiry under Strickland is highly deferential, and "every effort

17  [must] be made to eliminate the distorting effects of hindsight, to reconstruct the

18  circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

19  perspective at the time."  Id. at 689.  To prove deficient performance, a defendant must also

20  overcome "the presumption that, under the circumstances, the challenged action might be

21  considered sound trial strategy."  Id.  To demonstrate prejudice, a petitioner "must show that

22  there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

23  proceeding would have been different.  A reasonable probability is a probability sufficient

24  to undermine confidence in the outcome."  Id. at 694.

25         Under the AEDPA, the state court's decision is subject to another level of deference.

26  Bell v. Cone, 535 U.S. 685, 698-99 (2002).  In order to merit habeas relief, therefore,

27

28

Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of <u>Strickland</u>.  28 U.S.C. § 2254(d)(1). The Court finds that Petitioner has failed to satisfy either <u>Strickland</u> or the AEDPA's deferential standard.

### 1.   Failure to locate Duncan's wife.

Petitioner contends that Duncan's former wife, Sharon Sprayberry, possessed information that would have "completely impeached" Duncan's testimony regarding the statements Petitioner made during their jailhouse conversation.  (Dkt. 82 at 38.)  In an affidavit dated May 11, 1995, Sprayberry said that Duncan's visit to Petitioner was in fact arranged by Detective Halterman, that she was present at the conversation between Petitioner and Duncan, and, significantly, that "[d]uring the jail visit with Mr. Schad, Mr. Schad did not make any statements relating to a homicide in Arizona."  (ROA-PCR 319, Ex. 2.)

The PCR court rejected Petitioner's claim that trial counsel was ineffective for failing to locate Sprayberry and secure her testimony.[13]  (M.E. 6/21/96 at 2.)  The court explained that this failure was not prejudicial:

> The proposed testimony of Sharon Sprayberry is certainly not new – it is merely cumulative impeachment and it is therefore, not even particularly material.  Even if the testimony of Sharon Sprayberry as presented in affidavit form in this proceeding were accepted as true, this court cannot imagine how the outcome of this trial would have been changed by offering this rather limited impeachment testimony in the face of the overwhelming proof of the defendant's guilt from a variety of sources.  This claim has no merit.

(<u>Id.</u>)

This Court agrees that Petitioner has not shown that he was prejudiced by counsel's

---

[13]   In its order, the PCR court indicated that Sprayberry's "whereabouts were known by the defense at the time of the trial."  (M.E. 6/21/96.)  Petitioner disagrees, as does trial counsel (Dkt. 83, Ex. 3), but acknowledges that counsel's efforts to locate her were "diligent and thorough."  (Dkt. 82 at 39.)  Respondents observe that in his trial testimony Duncan indicated that his wife was in Johnson, Texas.  (RT 6/21/85 at 852.)  Given the Court's resolution of this issue on the grounds of lack of prejudice, the Court need not evaluate counsel's efforts to locate Sprayberry.

failure to present testimony from Sprayberry.  The key information provided in the Sprayberry affidavit has little or no impeachment value because it does not contradict Duncan's testimony.  According to Duncan, Petitioner told him that he would deny being in Arizona, particularly Prescott and Tempe; Duncan did not testify that Petitioner said anything about a homicide.  (RT 6/21/85 at 825.)  Duncan's testimony is therefore completely consistent with the statement in Sprayberry's affidavit that Petitioner "did not make any statements relating to a homicide in Arizona."  (ROA-PCR 319, Ex. 2.) The remaining information in the affidavit consists primarily of inadmissible double hearsay relating what Duncan told  Sprayberry about what Detective Halterman had told him.  (Id.)

Petitioner further contends that the PCR court employed the incorrect standard for evaluating prejudice under Strickland.  (Dkts. 82 at 40-41, 98 at 40.)  The court stated that it "cannot imagine how the outcome of this trial would have been changed" by presenting Sprayberry's testimony.  (M.E. 6/21/96 at 2.)  According to Petitioner, this statement indicates that the court employed a higher, or "preponderance of the evidence," standard for showing prejudice than that required by Strickland – i.e., a reasonable probability of a different outcome. (Dkt. 82 at 41.) The Court disagrees.  While the PCR court's formulation does not use the phrase "reasonable probability," the most plausible reading of the statement, keeping in mind the presumption that courts are presumed to know and apply the law, see, e.g., Beaty v. Stewart, 303 F.3d 975, 986 (9th Cir. 2002), is that in using the phrase "cannot imagine" the PCR court indicated that there was no reasonable probability that the outcome of the case would have been different if Sprayberry had testified.  See Kyles v. Whitley, 514 U.S. 419 (1995).  In any case, even under a de novo review of the issue, this Court finds that Petitioner's claim of prejudice lacks merit.

Petitioner was not prejudiced by trial counsel's failure to present testimony from Sprayberry.  The PCR court's denial of this claim was neither contrary to nor an unreasonable application of federal law.

### 2. Failure to properly present motions for the appointment of an expert on the victim's mental health and for the admission of the victim's mental health records.

Petitioner alleges that trial counsel was ineffective for failing to make a proper offer of proof regarding Mr. Groves' mental health records.  (Dkt. 82 at 45-49.)  Petitioner also claims that counsel's performance was ineffective based on his failure to move the trial court to reconsider its denial of his motion for the appointment of an expert witness regarding the victim's mental health.  (Id.)

Trial counsel, in an attempt to support one of his defense theories – that the victim committed suicide by strangling himself to death – moved the court to  appoint Dr. Otto Bendheim for the purpose of performing a "psychiatric autopsy" of Mr. Grove.[14]  (ROA-PCR 156.)  In his motion, counsel indicated that Dr. Bendheim had reviewed Mr. Grove's medical records and reached the "tentative conclusions" that at the time of his death "Mr. Grove was suffering from a depressive neurosis, schizophrenia and was psychotic," that his mental health had recently deteriorated, and that "he was potentially very suicidal."  (Id. at 3.)  The State filed a response in opposition to the motion (ROA-PCR 169), and defense counsel filed a reply memorandum (ROA-PCR 181), which again detailed counsel's arguments in favor of the admissibility of the records.  The trial court denied the motion summarily.  (M.E. 6/14/85.)

Near the close of his case, defense counsel sought to introduce Mr. Grove's medical records from the Veterans' Administration in Tucson; counsel made an oral offer of proof as to the contents and relevancy of the records.  (RT 6/27/85 at 1320-21.)  The trial court granted the State's motion to exclude the records, finding that the evidence adduced at trial

---

[14]   In his motion, counsel also advanced the proposition that Mr. Grove's deteriorating mental state may have led him to act recklessly and associate with dangerous persons. (ROA-PCR 156 at 2-3.) Petitioner no longer relies on this theory as a basis for the admissibility of information about the victim's mental state at the time of his death, presumably because it is indistinguishable from the scenario presented to the two juries that convicted Petitioner.

did not support the theory that Mr. Grove strangled himself, that Mr. Grove's medical records were irrelevant, that their introduction constituted an attack on the victim's character, and that the information contained therein would confuse the jury and be unduly prejudicial.  (Id. at 1323-24.)

In his preliminary PCR petition, Petitioner raised the claim that trial counsel's efforts to present evidence of Mr. Grove's mental health were deficient.  (ROA-PCR 245 at 9-10.) In rejecting the claims, the PCR court explained:

> [C]ounsel once again argues that Dr. Otto Bendheim should have been appointed to perform a psychological autopsy on the victim of this murder. Counsel now advances the theory that it was ineffective assistance of counsel to fail to move the court for reconsideration of its order denying this request and fail to introduce the victim's mental health records.  This court cannot imagine what would have been accomplished (after full briefing and oral argument) to move for reconsideration.  This court would not have reconsidered that ruling and is not reconsidering it now. The defendant has not pointed out how introduction of the psychological records would have swayed the court's judgment because of defendant is [sic] unable to do so.  There is no allegation that newly discovered evidence is now available to cause the court to reconsider what this court considers to be an imminently [sic] correct decision.  Quite simply put, defense counsel is under no obligation to file frivolous pleadings and this is precisely what the defendant is suggesting that counsel should have done.  The claim has no merit.

(M.E. 6/21/96 at 1-2.)

Petitioner again contends that counsel should have moved the court to reconsider its order denying the appointment of Dr. Bendheim; according to Petitioner, the appropriate procedure would have been for counsel to have made an offer of proof referencing the testimony of witnesses who had observed Mr. Grove's allegedly uncharacteristic behavior in the period leading up to his death.  (Dkt. 82 at 46.)  Petitioner also asserts that counsel should have made a more extensive offer of proof regarding the victim's medical records. (Id.)  Petitioner argues that such a proffer, which should have included testimony from Dr. Bendheim, would have remedied the trial court's misunderstanding regarding the purpose for which the records were being offered.  (Id. at 46-47.)

The Court notes that the issue underlying this aspect of Petitioner's IAC claim – the admissibility of evidence regarding the victim's mental condition – involves a state court's

evidentiary ruling.[15]   As the United States Supreme Court has explained, "it is not the province of a federal habeas court to reeaxmine state-court determinations on state-law questions."  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  Because the PCR court, applying state evidentiary rules, determined that the evidence was inadmissible, this Court cannot find that trial counsel was ineffective for failing to try a different tactic to secure its admission.

In addition, the Court finds that Petitioner was not prejudiced by the manner in which counsel sought permission from the court to raise the victim's mental health as a defense. It is apparent, for example, that the PCR court did not misapprehend the purpose of counsel's attempt to present evidence of the victim's mental health.  Counsel made it clear, in his filings seeking the appointment of Dr. Bendheim and in his oral offer of proof regarding the medical records, that his goal was to use such information to support his theory that Mr. Grove committed suicide.  In its order denying the IAC claim, the court explained that it made its rulings denying trial counsel's motions "after full briefing and oral arguments." (M.E. 6/21/96 at 2.)  The court then indicated that, even had trial counsel proceeded in the manner Petitioner now advocates, the court would not have reconsidered its evidentiary rulings.  (Id.)  Based upon the PCR court's order, this Court cannot find that Petitioner has shown any probability that trial counsel's failure to file a motion to reconsider or to present a more detailed offer of proof affected the trial court's rulings; consequently, Petitioner has failed to show that, absent the alleged deficiencies in counsel's performance, there was a reasonable probability that the outcome of the case would have been different.

For the reasons set forth above, the PCR court's rejection of Petitioner's guilt-stage IAC claims was neither contrary to nor an unreasonable application of clearly established federal law.  Therefore, Petitioner is not entitled to relief on Claim J.

---

[15]   Petitioner concedes that this aspect of his IAC claim is premised on a finding that the trial court erred in its rulings on defense counsel's motions. (Id. at 46.)  As discussed with respect to Claim AA, the Court has found that those rulings were not erroneous.

**Claim L:**      **Petitioner's rights under the Fifth, Eighth, and Fourteenth Amendments were violated by the use of his prior conviction for second-degree murder as an aggravating circumstance.**

Petitioner alleges that his rights were violated when the trial court improperly determined that his prior conviction for second-degree felony murder was an aggravating circumstance under former A.R.S. § 13-454(E)(1) ("that the defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable") and (E)(2) (prior conviction for a felony involving violence).[16] (Dkt. 82 at 50.) Petitioner also challenges the constitutional validity of the prior conviction. Petitioner's arguments lack merit.

### 1.      Background.

In 1968, a Salt Lake County jury convicted Petitioner of felony murder in the second degree. See State v. Schad, 24 Utah 2d 255, 257, 470 P.2d 246, 247 (1970). The court imposed a sentence of ten years to life. (ROA-PCR 223 at 3.) Petitioner appealed the conviction on the grounds that the evidence was insufficient to justify the verdict and that the trial court erred in giving a felony-murder instruction relating to sodomy. Schad, 24 Utah 2d at 257, 470 P.2d at 247. The Utah Supreme Court upheld the conviction. Id. at 261, 470 P.2d at 250.

Rejecting the first claim, the court reviewed the evidence produced at trial, which included undisputed facts that linked Petitioner to the victim and the crime scene and that contradicted Petitioner's version of events.[17] The court concluded that it was "unable to say

---

[16]      These aggravating factors are now codified at A.R.S. § 13-703(F)(1) and (F)(2).

[17]      The body of the victim, Clare Mortensen, was found in a closet; "his hands were tied behind his back with leather thongs and nylon cord; his ankles were also bound and two pieces of cloth were tied around his mouth and neck." Schad, 24 Utah 2d at 258, 470 P.2d at 247. Laces from a pair of combat boots were used to bind the victim; a witness observed that Petitioner's combat boots were missing their laces. Id. Petitioner, who was absent without leave from the Army at the time, was seen with the victim before his death;

- 32 -

that reasonable minds could not have believed beyond a reasonable doubt that the defendant committed the crime." Id. at 259, 470 P.2d at 248.

The Utah Supreme Court also rejected Petitioner's argument regarding the felony-murder instruction. Citing the state's murder statutes,[18] the court ruled:

> Defendant seems to essay the position that because the killing was not in the commission of one of the named felonies involving violence: arson, rape, burglary or robbery, there should have been no instruction on felony murder. This position is not tenable because it ignores the subsequent portions of our statute. It is not to be doubted that murder must come within the definition set forth therein. But that also provides for "any other homicide committed under circumstances which would have constituted murder at common law." This included death resulting from the perpetration of any felony. We agree with the reasoning of the cases cited by the defendant that in order for death to constitute murder because it results in the commission of a felony, the felony must be one which may cause death because it may be dangerous to human life. This reasoning correlates with the part of our statute making it murder if a death results from "any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life." However, we fail to see how that affords any comfort or protection to the

---

he subsequently lied to several acquaintances about the victim's whereabouts. Id. at 258-59, 470 P.2d at 247-48. After Mr. Mortenson's death Petitioner had possession of his wallet, which he discarded in his, Petitioner's, hotel room; he also used the victim's credit card to purchase an airline ticket to Germany, where he was eventually apprehended. Id. at 259, 470 P.2d at 248.

Physical evidence of a sexual encounter was found on the deceased, and the medical examiner, Dr. James Weston, opined that "death had resulted because deceased's neck had been bound so tightly it prevented a return flow of blood from his head; and that this had been done to heighten erotic stimulus in an act of sodomy." Id. Dr. Weston also indicated that in his opinion the death was probably accidental. (See RT 8/22/85 at 30.)

[18]     At the time of Petitioner's 1968 conviction, Section 76–30–3, U.C.A.1953, provided:

> Degrees of murder. – Every murder perpetrated by poison, lying in wait or any other kind of wilful, deliberate, malicious and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than the one who is killed; or perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life;– is murder in the first degree. Any other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree.

- 33 -

defendant in this case.  In listing certain felonies which are dangerous to the lives of others, it certainly was not intended to exclude other felonies which might be so; and this must be determined from the circumstances of the particular crime.

Id. at 260-61, 470 P.2d at 249-50.

### 2.    A.R.S. § 13-454(E)(1).

On federal habeas review of the state court's application of aggravating factors, this Court considers only whether the state court's finding "was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (counseling that such a review demands "respect for a state court's findings of fact and application of its own law"); see Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir. 2005).

Petitioner claims that the prior conviction was not an offense "for which under Arizona law a sentence of life imprisonment or death was imposable" under § 13-454(E)(1) because the Utah conviction did not satisfy the elements of second-degree murder in Arizona at the time he was convicted. (Dkt. 82 at 53-55.)  Petitioner contends that the 1968 conviction does not support a finding of "malice aforethought," an element of Arizona's second-degree murder statute.  (Id.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim, explaining that the facts surrounding the 1968 offense brought it into accord with Arizona's definition of second-degree murder:

> The main thrust of the defendant's argument is that the changes in the criminal code, reducing the punishment for sodomy to a misdemeanor and the elimination of the offense of second degree felony murder, require that the defendant's Utah conviction not be considered an aggravating circumstance for sentencing.  The defendant's argument seeks not only to have us ignore the requirement that we consider the penalty imposable at the time of the conviction, but it mischaracterizes the nature of the defendant's Utah conviction.

> In considering a prior offense for sentencing purposes, a court looks at the penalty in effect under Arizona law at the time the defendant was sentenced for the prior offense, not the penalty for the prior offense at the time of sentencing for a subsequent conviction. State v. Tittle, 147 Ariz. 339, 710 P.2d 449 (1985). The defendant concedes that pursuant to former A.R.S. §§ 13-453(B) and -1644, the maximum penalty for second-degree murder in 1968

was life imprisonment.  See State v. Williams, 103 Ariz. 284, 440 P.2d 311 (1968).  However, the defendant contends that aggravating his sentence under these circumstances would violate his constitutional rights.

Contrary to the contention implicit in defendant's argument, the prior conviction in Utah was not merely for committing sodomy.  The defendant was found guilty of committing a dangerous act while engaging in sodomy.  The Utah Supreme Court specifically found that sodomy performed while engaging in auto-erotic asphyxiation constituted a dangerous felony. See State v. Schad, 24 Utah 2d 255, 470 P.2d 246 (1970).

.   .   .

The defendant's second degree murder conviction in Utah was not based on the mere act of sodomy but *the manner* in which it was performed.  Schad, 24 Utah 2d at 261, 470 P.2d at 250.  Irrespective of the debate concerning the constitutionality of statutes prohibiting consensual sodomy, it is clear that a state may lawfully punish a person for engaging in conduct exhibiting a knowing or reckless disregard for human life. See A.R.S. §§ 13-1103(A)(1), -1104(A)(3).  This is the crux of the defendant's Utah conviction.  Under similar circumstances the defendant's conduct would have constituted second degree murder in Arizona.

Schad III, 163 Ariz. at 418-19, 788 P.2d at 1169-70.

Petitioner urges this Court to find that the Arizona Supreme Court erroneously interpreted Arizona's second-degree murder and manslaughter statutes.  (Dkt. 82 at 54-55.)  However, as the Ninth Circuit recently observed, "If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."  Horton v. Mayle, 408 F.3d at 576 (citing Mullaney v. Wilbur, 421 U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the expositors of state law, and that we are bound by their constructions except in extreme circumstances not present here") (citations omitted)); see Hawkins v. Mullin, 291 F.3d 658, 662-63 (10th Cir. 2002) (habeas court is bound by state court's interpretation of its felony-murder statute).

In determining that the circumstances surrounding the killing of Mr. Mortenson met the definition of second-degree murder in Arizona, the state supreme court construed its own law.  This Court is bound by that interpretation, and thus concludes that the state court's decision was neither arbitrary nor capricious.  See Jeffers, 497 U.S. at 780.  Therefore, Petitioner's claim that the state courts violated his constitutional rights by erroneously

applying the (E)(1) aggravating factor is without merit.

    **3.**    **A.R.S. § 13-454(E)(2).**

Petitioner contends that the trial court erred in finding that his prior conviction involved a crime of violence as defined by A.R.S. § 13-454(E)(2).  (Dkt. 82 at 55-56.)

In finding that this factor had been proved, the trial court took judicial notice that a killing in which the "victim was bound hand and foot, gagged and choked to death" was a crime involving violence.  (ROA-PCR 225 at 2.)  The court also found three aggravating circumstances.  (RT 8/29/85 at 10.)  Although the court indicated that "[e]ach is a very substantial factor in this court's sentencing decision," it concluded that "the total mitigation is not sufficient to overcome any one of the aggravating circumstances."  (Id.)

On direct appeal, the Arizona Supreme Court declined to determine whether the (E)(2) aggravating circumstance had been established:

> It is not necessary for us to resolve this issue because the trial judge, in his special findings, found that the total mitigation present was "not sufficient to overcome any one of the aggravating circumstances."  Any one of the other aggravating factors would be sufficient to support the sentence.

Schad III, 163 Ariz. at 419, 788 P.2d at 1170.

Because both the trial court and the Arizona Supreme Court, in its independent review of Petitioner's sentence, concluded that any one of the aggravating circumstances found by the trial court was sufficient to outweigh the totality of the mitigating evidence, it is unnecessary for this Court to review the trial court's findings regarding § 13-454(E)(2).  As discussed below, Petitioner cannot show that he was prejudiced by the trial court's determination that the prior conviction satisfied both (E)(1) and (E)(2).

    **4.**    **Constitutionality of the 1968 conviction.**

Petitioner raises several challenges to the constitutional validity of his 1968 conviction.  First, he alleges that he was denied appellate due process in the Utah courts based upon the "failure of the Utah Supreme Court to fairly and consistently apply the law in Petitioner's case."  (Dkt. 82 at 58-59.)  This allegation is premised on Petitioner's

characterization of the holding in State v. Bolsinger, 699 P.2d 1214 (Utah 1985), a case decided fifteen years after the supreme court affirmed Petitioner's conviction.[19]   (Id.) Petitioner also contends that the Utah and Arizona laws criminalizing consensual sodomy are unconstitutional and violate his equal protection and privacy rights.[20]   (Id. at 59.)

As Respondents note, Petitioner is precluded from challenging his prior conviction in this habeas action.  In Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 403-04 (2001) (citing Daniels v. United States, 532 U.S. 374, 382 (2001)), the United States Supreme Court explained that:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

Petitioner does not contend that his 1968 conviction remains open to direct or collateral attack.  (See Dkt. 98 at 55-56.)  Therefore, his constitutional challenges to the prior

---

[19]     In Bolsinger, a case involving a death caused by auto-erotic asphyxiation during consensual heterosexual sex, the court held that there was insufficient evidence to support a finding of depravity necessary for a second-degree murder conviction.  699 P.2d at 1219-21. As Respondents observe, Bolsinger involved the interpretation of a different murder statute, and was factually distinguishable from Petitioner's conviction on grounds other than the sexual orientation of the participants.  In Bolsinger, the defendant testified at trial, denying that he intended to harm the victim and explaining that he pulled on the clock radio cord around the victim's neck at her insistence during intercourse.  Id. at 1215-16.  In addition, the victim was highly intoxicated, which may have hastened her death.  Id. at 1216. Moreover, the victim in Bolsinger, unlike Mr. Mortenson, was not gagged, nor were her feet bound or her hands tied behind her back.  Id. at 1215.

[20]     In his Notice of Supplemental Authority, Petitioner cites Lawrence v. Texas, 539 U.S. 558 (2003). (Dkt. 111 at 5.)  In Lawrence, the Supreme Court, overruling Bowers v. Hardwick, 478 U.S. 186 (1986), held that the liberty interest protected by the Due Process Clause prohibits states from enacting laws criminalizing homosexual sodomy between consenting adults.

conviction are foreclosed and the Court need not address their validity.[21]

**5.      Miscellaneous arguments.**

Petitioner argues that he is entitled to relief because, after his 1968 conviction, Utah and Arizona reduced the offense of sodomy from a felony to a misdemeanor. (Dkt. 82 at 56.) According to Petitioner, this fact indicates that the imposition of the death penalty in his case was "wanton and freakish." (Id. at 57.)  As Respondents note, the Ninth Circuit has squarely rejected the argument that a subsequent reduction in the maximum sentence imposable for a prior conviction renders use of the § 13-454(E)(1) factor "offensive or arbitrary under the Constitution."  Gerlaugh v. Stewart, 129 F.3d 1027, 1044 (9th Cir. 1997).

Petitioner also contends that the trial court and the Arizona Supreme Court impermissibly "double-counted" the prior conviction. (Dkt. 82 at 57.) On direct appeal, the Arizona Supreme Court rejected Petitioner's argument that using the prior conviction as the basis for two aggravating factors violated his double jeopardy rights.  Schad III, 163 Ariz. at 419, 788 P.2d at 1170.  The court explained:

> So long as the trial court weighed the aggravating circumstances arising out of the 1968 murder only once, the defendant's rights have not been infringed. Here the trial judge found that the totality of the mitigating circumstances was insufficient to overcome even a single aggravating factor.  Hence, it did not matter that the trial court found two aggravating factors arising from his prior conviction since one was enough to impose the death penalty.

Id. (citation omitted).

Neither the trial court nor the Arizona Supreme Court weighed the 1968 conviction twice when assessing aggravating and mitigating factors.  In fact, as already noted, the Arizona Supreme Court explicitly declined to consider the (E)(2) factor in its independent review of Petitioner's sentence.  Petitioner's argument is without merit.

---

[21]      The Coss Court noted that an exception to this rule exists where the petitioner was denied his right to counsel in the prior case.  532 U.S. at 404.  This exception is not applicable because the record reflects that Petitioner was represented by counsel at his 1968 trial.  See Schad, 24 Utah 2d at 259, 470 P.2d at 248.

1

###### 6.    Prejudice.

2      A habeas petitioner is not entitled to relief unless he can establish that a trial error

3   resulted in actual prejudice.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see Allen v.

4   Woodford, 395 F.3d 979, 1011 (9th Cir. 2005).

5      In sentencing Petitioner the trial court found that three aggravating circumstances had

6   been proved and determined that the totality of the mitigation evidence was not sufficient to

7   outweigh any single aggravating factor. (ROA-PCR 223.)  After carrying out its independent

8   review, the Arizona Supreme Court affirmed the death sentence, finding that two aggravating

9   circumstances existed and agreeing with the trial court that the mitigation evidence was

10  insufficient to outweigh either aggravating factor.  Schad III, 163 Ariz. at 421, 788 P.2d at

11  1172.   Given these circumstances, even if this Court were to determine that the 1968

12  conviction could not form the basis of a valid aggravating factor, the existence of the

13  pecuniary gain factor would nonetheless be sufficient to support the death sentence.  Because

14  elimination of the factors associated with the 1968 conviction would not alter his sentence,

15  Petitioner cannot show that he was actually prejudiced by the use of the prior conviction as

16  an aggravating factor.

17     In reaching this conclusion, the Court rejects Petitioner's argument that prejudice

18  exists pursuant to the holding in Bullington v. Missouri, 451 U.S. 430 (1981).  According to

19  Petitioner, because the prior conviction formed the basis of the only two aggravating factors

20  found by the first sentencing court, if that conviction were invalidated, Bullington would bar

21  the imposition of the death sentence at Petitioner' retrial.  Petitioner contends, therefore, that

22  he was prejudiced by the state court's erroneous use of the prior conviction as an aggravating

23  circumstance.  Petitioner misconstrues the holding in Bullington.

24     In Bullington, the Supreme Court held that a capital defendant who is sentenced to life

25  imprisonment instead of death is protected by the Double Jeopardy Clause against imposition

26  of the death penalty in the event that he is retried and reconvicted.  Id. at 446; see Arizona v.

27

28

1 Rumsey, 467 U.S. 203, 211 (1984). This is because a life sentence for a defendant in such

2 a case represents "an acquittal on the merits of the central issue in the [sentencing]

3 proceeding – whether death was the appropriate punishment." Rumsey, 467 U.S. at 211.

4      This rationale does not apply, however, in a case such as Petitioner's, where the

5 defendant was not "acquitted" of the death penalty at the first trial but was in fact

6 "convicted" – i.e., sentenced to death. Poland v. Arizona, 476 U.S. 147, 154 (1986). In

7 Poland, the first trial court sentenced the defendants to death on the basis of a single

8 aggravating factor, that the crime was committed in an especially heinous manner. See State

9 v. Poland, 132 Ariz. 269, 285, 645 P.2d 784, 800 (1982). The court found that the pecuniary

10 gain factor did not apply.[22] Id. The Arizona Supreme Court reversed and remanded for

11 retrial on the grounds of jury misconduct; the court also noted that there was insufficient

12 evidence to support the "especially heinous" factor. Id. The defendants were convicted on

13 retrial, and the court again imposed the death sentence, this time finding that both the

14 pecuniary gain factor and the especially heinous factor had been proved. See State v. Poland,

15 144 Ariz. 388, 404, 698 P.2d 183, 199 (1985). The Arizona Supreme Court again determined

16 that the especially heinous factor had not been proved but found that the pecuniary gain

17 factor was properly applied and upheld the sentence. Id. at 405, 407, 698 P.2d at 200, 201.

18      In affirming the sentence, and distinguishing the case from Rumsey, where the

19 sentencing court found no aggravating circumstances, the United States Supreme Court

20 explained that "the proper inquiry is whether the sentencer or reviewing court has 'decided

21 that the prosecution has not proved its case' *that the death penalty is appropriate*." Poland,

22 476 U.S. at 155 (quotation omitted). In such a case, the Double Jeopardy Clause acts to

23 protect the finality of an acquittal. Id. at 156. By contrast, where a sentencer convicts a

24

25

26      [22]    As the supreme court pointed out, the trial court had misconstrued the
27 pecuniary gain factor, believing that it applied only to contract killings. Poland, 132 Ariz.
at 286, 645 P.2d at 801. See infra, p 42.

28

1    defendant of the death penalty, as the first trial court did with respect to Petitioner, "[t]here

2    is no cause to shield such a defendant from further litigation." Id.

3           Under Bullington, Rumsey, and Poland, a finding that Petitioner's 1968 conviction

4    was invalid would not transform his initial sentence into the equivalent of an acquittal of the

5    death penalty for double jeopardy purposes.  Therefore, contrary to Petitioner's contention,

6    his resentencing would not constitute a violation of the Double Jeopardy Clause.  Moreover,

7    because the state courts determined, after retrial, that the pecuniary gain aggravating factor

8    had been proved, and that it alone outweighed the totality of the mitigation evidence,

9    Petitioner cannot show harm resulting from the courts' application of additional aggravating

10   circumstances based upon the prior conviction.

11          For the reasons set forth above, Petitioner is not entitled to relief on Claim L.

12   **Claim M:    Pecuniary gain aggravating circumstance is unconstitutional on its face**

13   **               and as applied to Petitioner.**

14          In its special verdict, the trial court found that the State had proved that Petitioner had

15   "committed the offense as consideration for the receipt, or in expectation of the receipt, of

16   anything of pecuniary value" pursuant to the former A.R.S. § 13-454(E)(5) (now § 13-

17   703(F)(5)).  (ROA-PCR 225 at 2.)  In Claim M, Petitioner alleges that the pecuniary gain

18   factor is unconstitutional on its face and as applied to his sentence.  (Dkt. 82 at 60-66.)

19   Petitioner challenges the application of the factor to his sentence on the grounds that the

20   factor underwent a "judicial enlargement" prior to his second trial, thereby violating the

21   Constitution's bar on ex post facto laws.  (Id. at 60-61.)  Petitioner also claims that the

22   pecuniary gain aggravating factor is vague and overbroad and fails to narrow the class of

23   death-eligible defendants.  (Id. at 61-64.)  In a related argument, Petitioner contends that the

24   finding of the pecuniary gain factor was arbitrary and capricious because the factor repeats

25   an element of the underlying offense of felony murder.  (Id. at 63-64.)  Finally, Petitioner

26   contends that application of the factor to his sentence was not supported by sufficient

27   evidence.  (Id. at 64-65.)  Petitioner's arguments are without merit.

28

1

### 1.    Ex post facto violation.

Petitioner alleges that his due process rights were violated because in the interval between his two trials, the Arizona Supreme Court unforeseeably expanded the scope of the pecuniary gain aggravating factor when it explained, in <u>State v. Clark</u>, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980), that the factor was not limited in its application to murders committed by "hired guns."[23]   On direct appeal, the Arizona Supreme Court rejected Petitioner's ex post facto argument:

> The <u>Clark</u> opinion did not create substantive law, it merely recognized the pre-existing scope of present law.  It was not an unforeseeable enlargement nor did it suddenly make lawful conduct unlawful.  As in <u>Clark</u>, finding that the defendant committed this crime for pecuniary gain is not a violation of the defendant's due process rights.

<u>Schad III</u>, 163 Ariz. at 420-21, 788 P.2d at 1170-71.

As Petitioner acknowledges, the Ninth Circuit has also rejected this ex post facto argument.  <u>Poland v. Stewart</u>, 117 F.3d 1094, 1100 (9th Cir. 1997) ("The reading given to the statute by the Arizona Supreme Court in . . . <u>Clark</u> was not unforeseeable, nor an enlargement of the usual and ordinary meaning of the statute.").  This Court agrees with the Ninth Circuit that the language of (E)(5), which contains the phrase "or in expectation of the receipt, of something of pecuniary value," provided fair notice to Petitioner "that his conduct was 'at risk.'"  <u>Id.</u>

### 2.    Facial invalidity and double counting.

Petitioner alleges that the pecuniary gain aggravating factor fails to perform the constitutionally-mandated narrowing function and is therefore invalid on its face. Specifically, Petitioner contends that the factor impermissibly fails to "distinguish between

_____

[23]      In Petitioner's first trial, the court found that the pecuniary gain aggravating factor was not present.  (RT 12/27/79 at 4.)  This finding was based solely upon the court's presumption that "the legislative intent [of the pecuniary gain factor] was to cover a contract killing."  (<u>Id.</u> at 4-5.)  The court noted that if its presumption was incorrect – as it turned out to be, as announced by the holding in <u>Clark</u> – the factor would apply.  (<u>Id.</u> at 5.)

a premeditated killing for hire and one where the victim is killed without intent or premeditation during a robbery" and therefore "provides no meaningful basis for distinguishing those few cases in which a death sentence is appropriate from those many cases . . . in which it is not." (Dkt. 82 at 61.)  Petitioner also argues that the pecuniary gain factor fails to perform a narrowing function, and thus leads to the arbitrary imposition of the death penalty, because it repeats an element of the underlying offense in cases where a defendant is eligible for the death sentence based on a charge of felony-murder involving a robbery.[24]  (Id. at 64.)

On direct review, the Arizona Supreme Court rejected Petitioner's argument that the pecuniary gain factor was unconstitutionally vague.  Schad III, 163 Ariz. at 419, 788 P.2d at 1170.  By independently reviewing the record and affirming Petitioner's sentence, the supreme court implicitly rejected the argument that the trial court arbitrarily applied the pecuniary gain aggravating circumstance to Petitioner's sentence.  (See Dkt. 59 at 16.) Because the supreme court did not provide a rationale for this aspect of its holding, this Court has performed an independent review of the record pursuant to Pirtle v. Morgan, 313 F.3d at 1167.  The Court has determined that the ruling of the Arizona Supreme Court upholding the application of the pecuniary gain circumstance to Petitioner's sentence was not objectively unreasonable under controlling federal law.

As Respondents note, Petitioner's arguments are disposed of by the Ninth Circuit's holding in Woratzeck v. Stewart, 97 F.3d 329, 335 (9th Cir. 1996).  In Woratzeck, the court applied the principles set forth in Lowenfield v. Phelps, 484 U.S. 231, 244 (1988), to conclude that "[f]actor (F)(5) sufficiently channels the sentencer's discretion and does not

---

[24]     The trial court instructed the jury on both premeditated murder and felony murder.  (RT 6/27/85 at 1403-04.)  The court provided a single verdict form, however, so it is impossible to determine which theory of first-degree murder was the basis of the conviction.  Therefore, Petitioner's arguments in these subclaims are based upon the premise that the jury convicted him of felony murder.

result in unconstitutionally disproportionate imposition of the death penalty when applied to felony-murder defendants."   In reaching this conclusion, the court expressly rejected arguments identical to those raised by Petitioner. Id. at 334-35.  First, the court explained that the pecuniary gain factor is constitutionally permissible because it "is not automatically applicable to someone convicted of robbery felony-murder" and therefore "serves to narrow the class of death-eligible persons sufficiently." Id. at 334.  Next, citing State v. Greenway, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991), the Woratzeck court stated that the pecuniary gain factor does not result in double-counting between the elements of a felony murder charge and the pecuniary gain factor because not every felony murder that occurs in the course of a robbery is motivated by pecuniary gain; therefore, the motivation of pecuniary gain must be proven as a fact in addition to the elements of the underlying crime. Id. Finally, the court considered the argument that application of the pecuniary gain factor to a felony-murder charge results in an overbroad and arbitrary imposition of the death penalty. Id. at 335.  The Ninth Circuit rejected this argument, offering the following observation:

> That someone who intentionally kills might not be sentenced to death in Arizona does not mean that Woratzeck's death sentence is unconstitutional. If an intentional killing is done for pecuniary gain, then death is also a permitted penalty. Woratzeck's first-degree felony-murder conviction is treated no differently from any first-degree conviction for intentional killing and neither crime alone can result in death absent a finding of one or more aggravating circumstances. The State of Arizona could rationally conclude that a defendant's motive to murder more accurately reflects his relative culpability than whether the murder is done with an affirmative intent to kill or "merely" an utter disregard for whether the victim lives or dies.

Id.

The decision of the Arizona Supreme Court rejecting Petitioner's constitutional challenges to the pecuniary gain factor was neither contrary to nor an unreasonable application of federal law.

### 3.   Insufficient evidence.

Petitioner contends that there was insufficient evidence to show that the murder was committed for pecuniary gain. (Dkt. 82 at 64-66.)  He claims that the evidence suggesting

1  he killed the victim for pecuniary gain was circumstantial and susceptible to conflicting

2  interpretations. (Id. at 65-66.)

3        As noted above, when reviewing a state court's application of an aggravating factor,

4  this Court must determine whether the decision was so arbitrary or capricious as to result in

5  an independent constitutional violation. Lewis v. Jeffers, 497 U.S. at 780. In carrying out

6  this review, the Court applies the "rational factfinder" standard; i.e., "whether, after viewing

7  the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

8  have found" the aggravating factor to exist. Id. (quoting Jackson v. Virginia, 443 U.S. at

9  319) (emphasis in Jackson).

10       "[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-

11  703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the

12  murder, not merely the result of the murder." Moormann, 426 F.3d at 1054. On direct

13  review of this claim, the Arizona Supreme Court rejected Petitioner's argument that there

14  was insufficient evidence to prove that the murder of Mr. Grove was motivated by pecuniary

15  gain:

16
17           Prior to encountering the victim, the defendant was driving a stolen car. He
             abandoned that car and took the victim's car. He also left the murder scene
18           with the victim's wallet, money, credit cards and ring. This provides strong
             circumstantial evidence that the purpose of the murder was pecuniary gain.
19           The evidence strongly supports the finding by the trial judge that the
             aggravating circumstance of pecuniary gain existed in this case.

20  Schad III, 163 Ariz. 420-21, 788 P.2d at1171-72 (citation omitted).

21       The Court agrees. Based upon the facts proven at the trial, a rational factfinder could

22  have determined that Petitioner murdered Mr. Groves in the expectation of pecuniary gain.

23  See Correll v. Stewart, 137 F.3d 1404, 1420 (9th Cir. 1998); Woratzeck, 97 F.3d at 336.

24  Indeed, despite Petitioner's argument that the evidence could lead to contradictory

25  inferences, it is difficult to ascribe a motivation other than pecuniary gain to the offense

26  against Mr. Grove, who was a complete stranger to Petitioner. Compare State v. Wallace,

27  151 Ariz. 362, 368, 728 P.2d 232, 238 (1986) (insufficient evidence to support pecuniary

28

- 45 -

gain aggravating factor where defendant's motive was relationship difficulties with the victim and the taking of money and keys was incidental to the murder).

For the reasons discussed above, Petitioner is not entitled to relief on Claim M.

**Claim N:** **The trial court failed to consider and give effect to specific mitigating evidence.**

**Claim Q:** **The Arizona Supreme Court failed to consider, give effect to, and properly weigh mitigation evidence.**

Petitioner alleges that the trial court and the Arizona Supreme Court failed to consider and give effect to the mitigation evidence he presented at sentencing. (Dkt. 82 at 66-80.) The Court disagrees.

**1.     General principles.**

Under the constitution, in capital sentencing proceedings the sentencer must not be precluded from considering relevant mitigation evidence. See Lockett v. Ohio, 438 U.S. 586 (1978). In Lockett and subsequently in Eddings v. Oklahoma, 455 U.S. 104 (1982), the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. Eddings, 455 U.S. at 113-14. Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604. However, while the sentencer must not be foreclosed from considering relevant mitigation information, "it is free to assess how much weight to assign to such evidence." Ortiz v. Stewart, 149 F.3d 923, 943 (9th Cir. 1998); see Eddings, 455 at 114-15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence").

On habeas review the federal court does not evaluate the substance of each piece of evidence submitted as mitigation; rather, it reviews the state court record to ensure that the state court allowed and considered all relevant mitigation. See Jeffers v. Lewis, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered,

the trial court is not required to discuss each piece of such evidence).  As the Ninth Circuit has noted, "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'"  Moormann, 426 F.3d at 1055 (quoting Clark v. Ricketts, 958 F.2d 851, 858 (9th Cir. 1991)); see Parker v. Dugger, 498 U.S. 308, 314-15, 318 (1991) (the sentencing court properly considered all information, including nonstatutory mitigation, where the court stated that it considered all the evidence and found no mitigating circumstances that outweighed the aggravating circumstances); LaGrand v. Stewart, 133 F.3d 1253, 1263 (9th Cir. 1998); Gerlaugh v. Stewart, 129 F.3d at 1044; Poland v. Stewart, 117 F.3d at 1101.

## 2.    Claim N.

In Claim N, Petitioner contends that the trial court failed to give sufficient weight to four specific mitigating circumstances: (1) Petitioner's abusive, unstable childhood with an alcoholic father; (2) prior to the first trial the prosecution offered Petitioner a plea agreement that included a life sentence; (3) Petitioner's change of character on death row; and (4) the accidental and pleasurable nature of the victim's death in the Utah conviction.  Petitioner raised the latter two allegations, (3) and (4), on direct appeal.  (Appellant's Opening Brief at 43.)  He raised the first two allegations in his preliminary PCR petition (ROA-PCR 245 at 10-11), and the court denied them as procedurally precluded (M.E. 3/27/96).  Therefore, because the state courts did not reach the merits of allegations (1) and (2), this Court performs a de novo review.  Pirtle, 313 F.3d at 1167.

In sentencing Petitioner the trial court found three aggravating circumstances.  (ROA-PCR 225 at 1-2.)  The court then made findings with respect to statutory and nonstatutory mitigating factors.  (Id. at 3-5.)  The court indicated that it "considered all matters brought before it, including (without limitation) the pre-sentence report and attachments, the pre-sentence hearing and exhibits admitted at that hearing, the Defendant's sentencing

memorandum and the evidence adduced at trial." (Id. at 3.)  In his sentencing memorandum and at the sentencing hearing, Petitioner argued and presented extensive testimony regarding the four specific factors cited in Claim N.  (ROA-PCR 222 at 23-33; RT 8/22/85.)

The trial court found that Petitioner had not proved any of the statutory mitigating factors.  (ROA-PCR 225 at 3-4.)  With respect to nonstatutory mitigating circumstances, the court found that Petitioner was a "model prisoner" and that he "shows signs of rehabilitation and of possessing a good, stable character."  (Id. at 4.)  The court considered Petitioner's character and conduct in prison as "[t]he most persuasive mitigating circumstances."  (RT 8/29/85 at 9.)  The court also considered Petitioner's "unfortunate childhood" but concluded that it was "not a persuasive mitigating circumstance."  (ROA-PCR 225 at 4.)  The court explained that it "reject[ed] defendant's argument that the offer of a plea agreement at some time prior to a jury trial and conviction operates to limit the court's sentencing prerogatives."  (RT 8/29/85 at 9.)  In its assessment of mitigating factors, the court did not explicitly address Petitioner's arguments about the circumstances surrounding the Utah murder conviction.  The court concluded by stating that "[n]umerous mitigating circumstances were found to exist" but that "the total mitigation is not sufficient to overcome any one of the aggravating circumstances."  (Id. at 10.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim "that the trial court erred by failing to consider the defendant's potential for rehabilitation and the circumstances of the Utah murder."  Schad III, 163 Ariz. at 421, 788 P.2d at 1172.  The court explained:

> A.R.S. § 13-703(E) requires that the trial court "take into account the . . . mitigating circumstances" and then determine whether those circumstances are "sufficiently substantial to call for leniency."  Mitigating circumstances include "any factors . . . which are relevant in determining whether to impose a sentence less than death. . . ." A.R.S. § 13-703(G).
>
> Contrary to the defendant's claim, the trial court did find and consider the defendant's potential for rehabilitation.  Nevertheless, the trial court found this to be insufficient to overcome any of the aggravating factors.  We also reject the defendant's claim that the circumstances surrounding his prior

1
2
3

> murder conviction should be considered as a mitigating circumstance because the victim experienced "a pleasurable erotic experience" before he died. While it is clear that the Utah murder did not display the depravity present in the case at bar, the trial court did not find the circumstances of the earlier murder to be mitigating and neither do we.

4

Id.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

The Court agrees that the trial court carried out its constitutional obligation to consider all of the evidence offered in mitigation, including the four factors presented in Claim N. As discussed above, the trial court made specific on-the-record findings with respect to three of the four factors. (ROA-PCR 225 at 3-5; RT 8/29/85 at 6-10.)  The court also stated that it considered all of the mitigation arguments and evidence presented in Petitioner's memorandum and at the sentencing hearing. (ROA-PCR 225 at 3.)  Moreover, in its discussion of the prior conviction as an aggravating factor, the court again noted that it "has carefully reviewed all of the testimony and exhibits admitted at the sentencing hearing." (Id. at 2.)  The evidence referred to included testimony offered by two witnesses in support of Petitioner's argument that the circumstances of the 1968 murder – i.e., the fact that the victim's death appeared to be the accidental result of auto-erotic asphyxiation which occurred during a consensual sexual encounter – warranted consideration as a mitigating factor. (RT 8/22/85 at 28-33, 39-40, 44-47.)  Because the trial court considered all of Petitioner's arguments and evidence in support of mitigation – a key component of which was Petitioner's characterization of the 1968 murder – it is clear that in sentencing Petitioner, the court did consider the circumstances surrounding the prior conviction.  The court simply disagreed with Petitioner regarding the import of such information.  However, the fact that the court found the evidence "inadequate to justify leniency . . . did not violate the constitution." Ortiz, 149 F.3d at 943; see Eddings, 455 at 114-15.

25
26
27

The record indicates, and the Court finds, that the trial court considered all of the mitigation evidence presented by Petitioner, thereby fulfilling the directive set forth in Lockett and Eddings.  See Parker, 498 U.S. at 318.  In addition, the Court finds that the

28

decision of the Arizona Supreme Court rejecting allegations (3) and (4) was neither contrary to nor an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on Claim N.

### 3.    Claim Q.

In Claim Q, Petitioner contends that the Arizona Supreme Court, in its independent review of his sentence, failed to consider and give effect to the mitigating circumstances found by the trial court.  (Dkt. 82 at 77.)  Petitioner raised this claim in his preliminary PCR petition.  (ROA-PCR 245 at 12-13.)  The court denied the claim as procedurally precluded.  (M.E. 3/27/96.)  Because there is no state court ruling on the merits of this claim, the Court will perform a de novo review.  Pirtle, 313 F.3d at 1167

The Arizona Supreme Court detailed the results of its independent review of Petitioner's sentence:

> As is required at this point, we conduct our own independent examination of the record to determine whether the death penalty is properly imposed.  State v. Vickers, 129 Ariz. 506, 516, 633 P.2d 315, 325 (1981).  We note, however, that in 1981 we considered and affirmed the defendant's death penalty.  State v. Schad, 129 Ariz. 557, 633 P.2d 366 (1981), cert. denied, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982).
>
> Our review of the record satisfies us that the state proved that the defendant committed the murder for pecuniary gain.  The state also properly established an additional aggravating circumstance arising out of the defendant's prior murder conviction.  Thus, we find, without question, that there were at least two aggravating circumstances in the present case.
>
> We also conclude that the mitigating circumstances are insufficient to outweigh a single aggravating factor.  Although the defendant has continued to show exemplary behavior while incarcerated, we do not find this to be sufficiently substantial to call for leniency.  The evidence shows that the defendant strangled to death a 74-year-old man in order to obtain his vehicle and money.  At the time the defendant committed this act, he had previously been found criminally responsible for another person's death.  The death penalty is appropriate in this case.

Schad III, 163 Ariz. at 421, 788 P.2d at 1172.

Petitioner's argument is based upon the fact that the Arizona Supreme Court, in carrying out its independent review of the sentence, discussed only one mitigating factor,

- 50 -

Petitioner's exemplary behavior in prison. (Dkt. 82 at 77-80.) According to Petitioner, the supreme court's failure to discuss additional mitigating circumstances, which had been found or considered and rejected by the trial court, indicated that the court excluded those circumstances from consideration, thereby violating Lockett and Eddings. (Id. at 80.)

In carrying out its habeas review, this Court presumes that "state courts follow the law, even when they fail to so indicate." Jeffers, 38 F.3d at 415; see Poland, 117 F.3d at 1101. The law required the Arizona Supreme Court to undertake an independent review of Petitioner's sentence, and the court explicitly stated that it carried out "an independent review of the record to determine if the death sentence is properly imposed." Schad III, 163 Ariz. at 421, 788 P.2d at 1172. Nothing in the record overcomes that presumption.

A review of the Arizona Supreme Court's decision also supports a finding that the court undertook a sufficient independent review of the mitigation information contained in the record. For example, the supreme court did not consider and reject only a single mitigating factor; along with Petitioner's good conduct while incarcerated and his potential for rehabilitation, the court addressed Petitioner's arguments regarding the circumstances surrounding the prior murder conviction. Schad III, 163 Ariz. at 421, 788 P.2d at 1172. In doing so, the court directly addressed the two arguments regarding mitigation that Petitioner specifically raised on direct appeal. (Appellant's Opening Brief at 43.) In addition, as Respondents observe, the Arizona Supreme Court acknowledged that "the trial court found several mitigating factors." Id. at 417, 788 P.2d at 1168. In concluding its review of Petitioner's sentence, the supreme court referred to multiple mitigating factors when it stated that "the mitigating *circumstances* are insufficient to outweigh a single aggravating factor." Id. at 421, 788 P.2d at 1172 (emphasis added). It is clear that the Arizona Supreme Court was aware of the entirety of the mitigation evidence considered by the trial court; by independently reviewing that record, the court necessarily considered such evidence. Contrary to Petitioner's argument, the supreme court did not exclude any mitigating evidence

from its consideration.

Given the presumption that the supreme court followed the law, the court's explicit acknowledgment of its duty to perform an independent review of the record, the court's specific discussion of the mitigating factors raised by Petitioner on direct appeal, and the court's recognition that the trial court had found a number of mitigating circumstances, the Court concludes that the Arizona Supreme Court's review of Petitioner's sentence did not violate Petitioner's rights under Lockett and Eddings.  See Moorman, 426 F.3d at 1055; Jeffers, 38 F.3d at 418.  Therefore, Petitioner is not entitled to relief on Claim Q.

**Claim O:      Petitioner was sentenced in violation of his Due Process and Eighth Amendment rights because the presentence report contained inaccurate information.**

Petitioner alleges that the trial court relied on materially inaccurate information when it sentenced him to death.  (Dkt. 82 at 80.)  This information was contained in the presentence report, which, according to Petitioner, indicated that his record included three prior felonies, committed from 1959 to 1963, that were in fact misdemeanors.  (Id.) Petitioner raised this claim in his supplemental PCR petition. (ROA-PCR 319 at 9-10.)  The court rejected the claim.  (M.E. 6/21/96 at 2-3.)

A defendant who requests re-sentencing due to the use of inaccurate information at the original sentencing must show both that information before the sentencing court was inaccurate and that the court relied on the inaccurate information in formulating the sentence. United States v. Tucker, 404 U.S. 443, 447 (1972); Townsend v. Burke, 334 U.S. 736, 741 (1948); see Lechner v. Frank, 341 F.3d 635, 638-39 (7th Cir. 2003) (sentencing court demonstrates actual reliance on misinformation in determining sentence when it gives explicit attention to it, bases its sentence at least in part on the information, or gives specific consideration to the information before imposing sentence).

As Respondents note, the trial court relied on only one prior felony as an aggravating factor in sentencing Petitioner, the Utah second-degree murder conviction.  In sentencing

1   Petitioner to death, the court did not – and could not – consider the other felonies contained

2   in the presentence investigation because those offenses did not constitute statutory

3   aggravating factors, which, under Arizona's death penalty scheme, are the only factors the

4   court was permitted to consider.  In its special verdict, the court gave no indication that it

5   considered the information Petitioner now asserts is inaccurate.  (M.E. 8/29/85; ROA-PCR

6   225.)  Because the court did not rely on inaccurate information in sentencing Petitioner,

7   Petitioner is not entitled to relief on Claim O.

8   **Claim P:        Ineffective assistance of counsel – sentencing.**

9   Petitioner alleges that counsel was ineffective at sentencing for failing to investigate

10   Petitioner's family background and to present corroborating evidence concerning the nature

11   and effects of his abusive childhood.  (Dkt. 82 at 88.)  Petitioner further contends that post-

12   conviction counsel were diligent in developing this claim, and this Court should review the

13   newly developed information he has attached to his habeas filings and hold an evidentiary

14   hearing.  (Id. at 89-91.)  Respondents counter that the sentencing-stage performance of trial

15   counsel was neither deficient nor prejudicial because counsel did present the mitigating

16   information available at the time of sentencing, and that post-conviction counsel were not

17   diligent in developing the facts Petitioner now proffers. (Dkt. 91 at 63-66.)

18   **1.        Background.**

19   There is no dispute that trial counsel argued forcefully against a death sentence for

20   Petitioner and that in doing so he raised, among other issues, the mitigating effect of

21   Petitioner's traumatic upbringing.[25]   Counsel filed a thirty-nine-page sentencing

22   memorandum that included a section outlining the "emotional harm" caused by Petitioner's

23

24   _____

25          [25]        In his memorandum and at the presentencing hearing, trial counsel emphasized
    Petitioner's good character, exemplary prison record, and potential for rehabilitation, factors
26   which the trial court accepted as mitigating circumstances. (ROA-PCR 225 at 4).  Petitioner
    also challenged the use of his prior murder conviction as an aggravating circumstance.
27   (ROA-PCR 222 at 2-8; RT 8/22/85 at 28-34, 43-48.)

28

abusive childhood. (ROA-PCR 222 at 31-32.) The memorandum referenced the presentence report, which contained a somewhat more detailed account of Petitioner's "stormy childhood" and its impact on Petitioner's emotional health and development. (ROA-PCR 223 at 3-4.) The report indicated that Petitioner's father was psychologically unstable and an abusive alcoholic who beat Petitioner with his fists; that Petitioner would accept beatings from his father in order to protect other family members; that at age seventeen he attempted to have his father committed but after his mother withdrew her support from this course of action his father beat him severely; that his father prevented him from engaging socially with others; and that these experiences caused Petitioner to suppress his feelings and spend time away from home, until he left home at age eighteen. (Id.) In the report, however, Petitioner indicated that he did not have any emotional problems. (Id. at 6.) Similarly, at the presentencing hearing, Dr. Bendheim alluded to Petitioner's "deprived" childhood (RT 8/25/85 at 51), but did not indicate that any mental health issues had resulted from that deprivation. Having reviewed this information, the trial court concluded that Petitioner's "unfortunate childhood" was not a "persuasive mitigating circumstance." (ROA-PCR 225 at 4.)

On December 16, 1991, attorney Denise Young filed a preliminary PCR petition. (ROA-PCR 245.) The petition did not include a claim that trial counsel's performance at sentencing was ineffective.[26] (Id.) Petitioner was subsequently represented by attorney John Williams. (M.E. 12/19/91). The court ordered Mr. Williams to file a supplemental petition by February 18, 1992 (id.), but subsequently granted each of Mr. Williams's motions to extend that deadline (M.E. 2/14/92, 3/18/92, 4/17/92, 8/6/92, 10/14/92). On November 3,

_____

[26]    The petition included a claim that the trial court violated Petitioner's rights by rejecting his traumatic upbringing as a mitigating factor. (Id. at 11.) The petition accurately observed that, "Undisputed mitigation evidence was presented that [petitioner] was raised in an abusive, unstable, and alcoholic family and that petitioner was beaten severely by his father and forbidden to interact with other children." (Id.)

1992, Mr. Williams was replaced by attorney Michael Chezem. (M.E. 11/3/92.) The court also granted Mr Chezem's motions to extend the time for filing a supplemental PCR petition. (M.E. 1/5/93, 2/2/93, 4/14/93, 5/14/93, 6/28/93, 7/30/93, 8/19/93, 9/27/93, 10/25/93, 11/29/93, 12/27/93, 2/1/94.)  Mr. Chezem filed a motion seeking the appointment of an investigator, Palmer Investigative Services. (ROA-PCR 263.)  On July 30, 1993, the court granted the motion and provided funds for the investigator. (ROA-PCR 264.)

On January 31, 1994, Mr. Chezem withdrew from his representation of Petitioner and was replaced by attorney Rhonda Repp. (ROA-PCR 276.)  On February 1, 1994, the court granted Ms. Repp's request for authorization of further investigative services. (M.E. 2/1/94.) Ms. Repp moved to extend the deadline for filling a supplemental PCR petition on the grounds that she and the court-appointed investigator had not completed their investigation and located all potential witnesses; the court granted the motions. (M.E. 2/16/94, 3/18/94, 4/22/94, 5/24/94, 6/23/94, 7/22/94, 8/30/94, 9/27/94, 10/31/94, 11/21/94, 12/28/94, 1/18/95, 2/21/95, 4/20/95.)

On March 28, 1995, more than a year after her appointment, Ms. Repp sought the services of a mitigation expert, Holly Wake (ROA-PCR 301-2.)  On July 6, 1995, the court authorized Ms. Wake's appointment.  (ROA-PCR 309.)

Ms. Repp then requested additional extensions of the filing deadline for the supplemental petition, which the court again allowed. (M.E. 5/22/95, 6/20/95, 7/21/95, 8/22/95, 9/20/95.)  On September 20, 1995, the court ruled that no further continuances would be granted. (M.E. 9/20/95.)  In total, the court granted thirty-four extensions for post-conviction counsel; seventeen of these were requested by Ms. Repp.  The court denied Ms. Repp's request for contact visits between Petitioner and Ms. Wake (M.E. 11/20/95) and her motion for disclosure of Petitioner's Department of Corrections file (M.E. 12/27/95).

On September 26, 1995, the State filed a motion to dismiss the petition with prejudice on the grounds that the amended petition was untimely.  (ROA-PCR 315.)  In its order

denying the motion, the court recounted the history of the PCR proceedings and observed that, "Certainly, during the course of all this time <u>some</u> of the delays were occasioned by extraordinary circumstances." (M.E. 11/20/95 at 2.)

On October 19, 1995, Ms. Repp filed a supplemental PCR petition, alleging, on the basis of "newly discovered" mitigation evidence, that trial counsel's performance at sentencing had been ineffective. (ROA-PCR 319 at 6-12.) Ms. Repp also sought an evidentiary hearing. (<u>Id.</u> at 1.)

Attached to the supplemental PCR petition was an affidavit prepared by Ms. Wake. (<u>Id.</u>, Ex. 2.) In the affidavit, Ms. Wake indicated that she had interviewed Petitioner for four hours and that, based on the information he provided, she concluded that the presentence report "failed to adequately address the seriousness of the abuse [Petitioner] suffered as a child and teenager." (<u>Id.</u> at 3.) However, Ms. Wake's discussion of the new information received from Petitioner added very little to the details set out in the presentence report. (<u>Id.</u>) Ms. Wake reported that Petitioner had "forgotten many of the details surrounding his younger years." (<u>Id.</u> at 2.) Ms. Wake also indicated that she wished to review additional records and interview family members; she acknowledged, however, that in the past Petitioner's family members had proven reluctant to cooperate and difficult to locate.[27] (<u>Id.</u> at 3.)

On June 21, 1996, without holding a hearing, the court denied the claims presented

---

[27]    In a report dated December 3, 1993, and submitted to Mr. Chezem, Petitioner's investigator indicated that she had located Petitioner's mother in New York state. (Dkt. 91, Ex. D.) According to the investigator:

I contacted Mrs. Hughes, and she stated that she would not tell me where Mr. Schad's siblings were, or how to get in touch with them. All she would say is that Edward was a good boy when he was at home, growing up, and then she hung up on me. I feel that the rest of the family would be hard to find, and even if we did succeed, I do not believe that they would cooperate with us.

(<u>Id.</u> at 2.)

in the supplemental petition, including the claim that counsel was ineffective at sentencing.
The court explained:

> [D]efendant contends that counsel was ineffective for failing to uncover
> mitigating evidence that might exist.  If the mitigation evidence then turns out
> to be favorable to the defendant, resentencing might be appropriate.  Defendant
> is simply suggesting that it would be a good thing to delve further into
> defendant's prior convictions and to try once again to talk to family members,
> etc., etc.  Defendant is simply asking to go on a fishing expedition with no
> showing of what would be turned up that the court did not know at sentencing
> time and how that might effect [sic] sentencing.  This claim has no merit.

(M.E. 6/21/96 at 2-3.)

On July 8, 1996, Ms. Repp filed a motion for rehearing in which she stated, without
elaboration, that "mitigation evidence available, but not presented, at [Petitioner's]
sentencing hearing would have resulted in a life sentence."  (ROA-PCR 341 at 1.)  The
motion again requested an evidentiary hearing but did not indicate what witnesses would be
called or what the nature of the testimony would be.  (Id. at 2.)  Ms. Repp also filed another
declaration by Ms. Wake.  (ROA-PCR 342.)  Ms. Wake repeated her characterization of trial
counsel's mitigation effort as inadequate and described the information in the presentence
report as "limited and incomplete."  (Id. at 3.)  She indicated that "[t]hrough complete
interviews, additional information concerning [Petitioner's] abuse has been obtained," but
again failed to specify what that information was and did not attach any supporting affidavits
or reports.  (Id.)  The court summarily denied the motion for a rehearing.  (M.E. 7/24/96.)

### 2.    New information.

In support of Claim P, Petitioner has submitted a number of exhibits that contain
information never presented to the state courts.  These include an affidavit, dated October 5,
1999, in which Petitioner's mother, Mabel Hughes, recounts her experiences with
Petitioner's father, who had been wounded and held as a prisoner of war while serving in
Europe during World War II.  (Dkt. 82, Ex. 4.)  According to Mrs. Hughes, Mr. Schad's
behavior deteriorated when he returned from overseas; he drank excessively, could not hold
a job, and physically abused her; at one point he was committed to a psychiatric ward.  (Id.)

Mrs. Hughes' affidavit only briefly touches upon Petitioner's childhood and his relationship with his father; she attests that Mr. Schad was "really hard on" Petitioner when he was a small child and that Mr. Schad did not want her to show Petitioner any affection.  (Id. at ¶ 28.)  She also states that Petitioner had friends when he was growing up but did not bring them to the house.  (Id. at ¶ 29.)

Petitioner has also submitted an affidavit from Lili Deputa, an investigator with the Federal Public Defender's Office in Tucson. (Dkt. 82, Ex. 5.)  The affidavit is dated July 10, 2000, and recounts a conversation between Ms. Deputa and Petitioner's sister, Susan, that took place in September 1998.  (Id. at 1.)  According to Ms. Deputa, Ms. Schad described growing up in a poor household where gifts and new clothes were rare; for Christmas the children received one or two presents "at the most."  (Id. at 2.)   Ms. Deputa reports that Ms. Schad characterized the family as secretive and the parents as "cold and distant" toward the children and toward each other.  (Id. at 1-2.)  According to Ms. Schad, the parents showed no emotional or physical affection for the children.  (Id. at 2.)  Ms. Schad also acknowledged her father's severe alcohol problem.  (Id.)  Ms. Deputa's affidavit also includes information obtained from an interview with Petitioner's aunt, Mr. Schad's sister, who discussed the religious upbringing of her generation of Schads, Mr. Schad's war experiences, and the fact that Petitioner's infant sister died suddenly and her twin brother had a bad eye which went undiagnosed until he started school.  (Id. at 4-5.)

Additional new information, provided in support of Claim P, includes employment records of Petitioner's mother (Dkt. 82, Ex.11), and the Veterans' Administration records of Petitioner's father (id., Ex. 13) and younger brother, Thomas Schad (id., Ex. 12).  According to Petitioner, his mother's records indicate that she was frequently injured and that the treatment for those injuries, which included the prescription of narcotics, affected her parenting ability. (Dkt. 82 at 86-87.)  The V.A. records of Petitioner's father show that he returned from overseas suffering from a disabling anxiety disorder and that his mental

condition and behavior worsened over the years. (Dkt. 82, Ex. 13.)  As documented in the records, however, the most extreme episodes occurred when Petitioner was an adult and out of the home.  (Id.)  The V.A. records of Thomas Schad, a wounded Viet Nam veteran, indicate that he suffered from post-traumatic stress disorder and alcoholism.  (Id., Ex. 12.) Various reports in these records document Thomas Schad's family history; he reported that his father was an alcoholic and had suffered a nervous break-down in 1970; he also indicated that his father was "strict but fair" with respect to discipline, and that his mother, a housewife, was "gentler."  (Id.)

In his reply to Respondents' brief on the merits, Petitioner included an affidavit prepared by Dr. Leslie Lebowitz, a clinical psychologist. (Dkt. 98, Ex. K.)  The affidavit, dated May 29, 2001, focuses on the mental health of Petitioner's parents.  (Id. at 3.)  Based upon the sources of information discussed above, and her own interview of the eighty-year-old Mrs. Hughes in 1999, Dr. Lebowitz concluded that Petitioner's family was "profoundly dysfunctional," that his father was "completely disabled" as a parent due to his severe post-traumatic stress disorder and alcoholism, and that his mother was so "disengaged" from her children as to be guilty of criminal neglect.  (Id. at 20-21.)  According to Dr. Lebowitz, the violence and neglect experienced by the Schad children left them at a "tremendous disadvantage when faced with the challenges of adult life."  (Id. at 22.)

On August 26, 2004, Petitioner filed a notice of supplemental authority.  (Dkt. 111.) Petitioner attached to the notice a ninety-two-page affidavit prepared by a clinical psychologist, Charles Stanislaw.  (Id., Attach.)  Dr. Stanislaw prepared a detailed "social history" of Petitioner in support of Petitioner's claim of IAC at sentencing.  (Id.) Respondents moved to strike the notice of supplemental authority (Dkt. 112); the Court granted the motion with respect to the Stanislaw affidavit (Dkt. 114).  Petitioner then filed a motion to expand the record (Dkt. 115), which Respondents opposed (Dkt. 116). The Court denied the motion without prejudice, indicating with respect to the motion to expand the

record and the other new information Petitioner has presented, that when the Court addressed the merits of Claim P, it would also make a determination whether Petitioner had diligently attempted to develop the factual basis of the claim in state court. (Dkt. 120.)

In his affidavit, Dr. Stanislaw repeats the family background discussed above and offers his opinions concerning the mental health of Petitioner's parents and the effect of their condition, and of other social and economic factors, on Petitioner's psychological development. (Dkt. 111, Attach.)  He also offers a biography that chronicles Petitioner's education, military service, and criminal activities, and theorizes about the cause of Petitioner's erratic and self-defeating behaviors. (Id.)  Dr. Stanislaw concludes that Petitioner "exhibited many symptoms indicative of a severe and chronic illness.  His history of abuse, neglect, and abandonment cannot be ruled out as playing a significant factor in [his] psychiatric and behavioral functioning as an adult." (Id. at 90.)

### 3.    Analysis.

The Court concludes that Petitioner has failed to show that the PCR court's denial of his claim of IAC at sentencing was an unreasonable application of federal law.  The Court further finds, with respect to Petitioner's attempt to introduce factual information that was not presented to the state court, Petitioner was not diligent in developing these facts.  See infra, pp. 82-84.  Moreover, the Court finds that even if Petitioner had been diligent and the new materials were properly before the Court, Claim P is without merit.

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial."  Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Clabourne v. Lewis, 64 F.3d at 1378).  Trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Hayes v. Woodford, 301 F.3d 1054, 1066 (9th Cir. 2002)

(quoting Strickland, 466 U.S. at 691).    To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." Wiggins v. Smith, 539 U.S. at 523 (citation and quotation marks omitted).  As the Supreme Court recently reiterated, "In judging the defense's investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgments.'"  Rompilla v. Beard, 545 U.S. 374, ___, 125 S.Ct. 2456, 2462 (2005) (quoting Strickland, 466 U.S. at 689, 691).

With respect to prejudice, the Strickland Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.  In Wiggins, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." 539 U.S. at 534.  The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." Id. at 536 (quoting Williams v. Taylor, 529 U.S. at 397-98).

Petitioner has not demonstrated that trial counsel's performance at sentencing was either deficient or prejudicial.  Instead, the Court finds that trial counsel presented a strategically sound case in mitigation and that the information Petitioner now contends should have been presented is not of sufficient weight to create a reasonable probability that, if it had been presented, the trial court would have reached a different sentencing determination.

The focus of trial counsel's attempt to secure a life sentence for Petitioner was the argument that Petitioner, despite the offenses for which he had been convicted, was a

changed man who had become "an outstanding prisoner and an outstanding asset to the prison community."[28]   (ROA-PCR 222 at 28.)    The trial court agreed with counsel's arguments and found that Petitioner's "good, stable character" and status as a "model prisoner" constituted mitigating circumstances. (ROA-PCR 225 at 4.) Petitioner now bases his argument that trial counsel was ineffective on counsel's failure to offer information that is inconsistent with this presentation of Petitioner as a man who has triumphed over adversity.

For example, as Respondents note in their opposition to Petitioner's motion to expand the record (Dkt. 116 at 12), Dr. Stanislaw's characterization of Petitioner's character and mental health stands in stark contrast to the arguments and information trial counsel presented on his behalf at sentencing. Dr. Stanislaw opines that Petitioner is mentally ill and "has exhibited symptoms of paranoia, anxiety, and mania, and his presentation is complicated by his history of trauma." (Dkt. 111, Attach. at 91.) He "conceals his psychopathology." (Id.) He "displays impoverished speech." (Id.) He "has a pattern of repeating astonishingly self-defeating behaviors."    (Id.)    According to Dr. Stanislaw, "In addition to manic symptoms, [Petitioner] displays classic signs of chronic depression including a foreshortened sense of future. When not defending against depression with an energized, overly optimistic or manic state, hopelessness and helplessness are evident and appear to overwhelm him by disorganizing his thoughts and speech patterns." (Id.)

---

[28]      As noted previously, another focus of counsel's sentencing-stage strategy was to attack the validity of Petitioner's prior conviction as an aggravating factor.    In implementing this strategy, counsel presented the testimony of Stephen Love, an official with the Utah Board of Pardons. (RT 8/22/85 at 22-36.) Mr. Love testified that he believed that Petitioner was wrongfully convicted of murder because the victim's death was accidental and that Petitioner was not a cold-blooded killer. (Id. at 34.) Counsel also elicited substantial testimony from Dr. Bendheim in support of his position that the prior conviction did not qualify as an aggravating circumstance and that Petitioner was not a violent individual. (Id. at 45-49.) This testimony complemented the evidence indicating that Petitioner had a sound character and was worthy of a life sentence.

At sentencing, counsel presented evidence intended to show Petitioner as a man whose character and capabilities would enable him to benefit society. The evidence included letters and testimony in support of Petitioner from pastors and church members who indicated that Petitioner was a kind, caring, intelligent, articulate, accomplished individual who had "changed his life" and overcome his "miserable childhood." (See ROA-PCR 223; RT 8/22/85 at 80-89, 101-23, 132-53.) In contrast to Dr. Stanislaw's characterization of Petitioner as irremediably damaged by childhood trauma, these individuals portrayed Petitioner as a "solid citizen," "very stable," "in control," "positive," "never despondent," motivated and focused, and an ideal candidate for rehabilitation. (Id.) Dr. Bendheim and John Powers, a social worker at the Utah prison where Petitioner was incarcerated, offered similar testimony. Dr. Bendheim testified that although Petitioner had a "miserable childhood" and was an "unloved child," he had since rehabilitated himself. (RT 8/22/85 at 48, 51). Mr. Powers testified that Petitioner had made "great strides" in dealing with his issues; Petitioner's conduct in prison, supported by the results of psychological tests, indicated to Mr. Powers that his release on parole in 1978 was appropriate. (Id. at 59, 66.) According to Dr. Stanislaw, however, the qualities and accomplishments testified to by these witnesses and noted by Petitioner's supporters – Petitioner's positive influence on other inmates, for instance, and his educational achievements – are nothing more than a "display of inflated self-esteem, grandiosity, and an inflated sense of one's own significance." (Dkt. 111, Attach. at 77.)

Trial counsel's performance cannot be considered deficient for failing to present these opposing versions of Petitioner – i.e., as both rehabilitated and exemplifying a number of personal strengths and virtues which could be used to benefit others, and as an unstable and disoriented individual incapable of completing a task.[29] Circuit courts have recognized that

---

[29] This is true particularly because Petitioner also maintains that the state courts did not place sufficient weight on the positive aspects of Petitioner's present character and

mental health evidence is a "double-edged sword," and that counsel's decision not to present such information can "exemplif[y] . . . reasonable strategic judgment," particularly when counsel focuses his mitigation argument on the defendant's character or amenability to rehabilitation.  Truesdale v. Moore, 142 F.3d 749, 754 (4th Cir. 1998) (counsel exercised reasonable strategic judgment by "steer[ing] away from" evidence of organic brain dysfunction, "calculating that it would not help portray [Petitioner] as normal and capable of rehabilitation"); see Glock v. Moore, 195 F.3d 625, 636-40 (11th Cir. 1999) (counsel not ineffective for failing to develop evidence of petitioner's post-traumatic stress disorder related to childhood abuse because, inter alia, presenting such information would have made it "less likely . . . the court would have found that he was a good character for rehabilitation"); Bonin v. Calderon, 59 F.3d 815, 834-35 (9th Cir. 1995) (reasonable for counsel not to further investigate client's psychiatric condition when counsel made tactical decision to rely on "institutional adjustment" as primary mitigation theory); cf. Gerlaugh, 129 F.3d at 1034 (lay witness testimony regarding petitioner's good character and behavior conflicted with expert testimony that he was a sociopath).  Trial counsel's argument that Petitioner was worthy of a sentence less than death based upon a prospective consideration of his positive attributes represented a reasonable strategy in mitigation.  Counsel's performance was not deficient under Strickland.

The Court further finds that Petitioner has not satisfied Strickland's prejudice prong. Petitioner claims that trial counsel failed to investigate and develop "readily available" information about Petitioner's dysfunctional childhood. (Dkt. 82 at 88.)  According to Petitioner, if counsel had located and presented this mitigation evidence, it would have corroborated the information that the trial court heard and rejected.  (Id.)  The Court disagrees with this characterization of the new material.

The affidavits submitted by family members and psychologists repeat, rather than

_____

state of mind. (Dkt. 82 at 66-80.)  See supra, pp. 47-50.

corroborate or elaborate on, the specific details of abuse included in the presentence report. Despite the volume of additional materials subsequently filed, the information in the presentence report remains the most detailed account of the abuse suffered by Petitioner at the hands of his father. The Court notes, for example, that Dr. Stanislaw, who interviewed Petitioner during two contact visits, does not report any additional information concerning Mr. Schad's violence against Petitioner; instead, when documenting the abuse Petitioner suffered, Dr. Stanislaw frequently relies on the details contained in the presentence report. (Dkt. 111, Attach. at 43, 46, 49-50, 90.)

Much of the remainder of the new material emphasizes the dysfunctional nature of Petitioner's childhood household. The affidavits of Drs. Lebowitz and Stanislaw include detailed biographies of Petitioner's parents and the affiants' opinions regarding the mental condition of Petitioner's mother as well as his father. Much of this information is speculative and of limited relevance. For example, Petitioner now contends that his mother's parenting ability was impaired because she was often under the influence of narcotics. (Dkt. 82 at 86-87.) This theory appears to be based entirely on a review of Mrs. Hughes's employment records, which date from 1952 to 1981. (Dkt. 98, Ex. K at 20.) In her affidavit, Dr. Lebowitz observes that Mrs. Hughes was prescribed phenobarbital for nervousness resulting from family issues and on numerous occasions received prescriptions for narcotic painkillers. (Dkt. 98, Ex. K at 20.) The records show, however, that Mrs. Hughes was first prescribed phenobarbital in 1959, when Petitioner was seventeen years old, and received her first prescription for a painkiller in 1961. (Dkt. 82, Ex. 11.) Based upon this information, there is no evidence that Mrs. Hughes's functioning was impaired by the abuse of narcotics during Petitioner's childhood and adolescence.

Furthermore, the relevance of information concerning Petitioner's troubled childhood and the parenting deficiencies of his mother and father must be taken in context with the fact that Petitioner was thirty-six years old when he killed Mr. Grove, and had been out of the parental home for some eighteen years. Prior to 1978, Petitioner had served two terms in the

Army and had lived overseas.  (ROA-PCR 223 at 7.)  While serving his sentence for the 1968 murder he had established a record as a model prisoner and gained the trust of prison officials who recommended parole on the grounds that Petitioner had addressed his psychological issues and did not represent a threat to society.  (RT 8/22/85 at 59-67.)  Petitioner's age and life experience attenuates any causal connection between Petitioner's dysfunctional childhood and the 1978 murder.  See State v. Djerf, 191 Ariz. 583, 598, 959 P.2d 1274, 1289 (1998) ("Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior"); State v. Newell, 212 Ariz. 389, 405, 132 P.3d  833, 849 (2006) (lack of a "nexus" between the mitigating factor and the crime "may be considered in assessing the quality and strength of the mitigation evidence").  For these reasons, Petitioner was not prejudiced by counsel's failure to present additional information describing the nature of Petitioner's traumatic childhood.

Finally, while the Court notes that the new materials, particularly the affidavit of Dr. Stanislaw, offer a more elaborate explanation of the psychological effect of Petitioner's childhood experiences, this information is either cumulative or, as discussed above, contradictory to the portrait of Petitioner that trial counsel presented at sentencing.  The presentence report presented uncontradicted evidence from a credible source that Petitioner experienced severe childhood abuse and that the abuse affected his social and emotional development.  (ROA-PCR 223 at 3-4.)  The trial court considered this evidence but found it "unpersuasive" in terms of mitigation and ultimately sentenced Petitioner to death. (ROA-225 at 4.)  Petitioner has not shown a reasonable probability that the court's decision would have been different if trial counsel had presented additional evidence expanding the scope of Petitioner's claim of childhood abuse and neglect and analyzing Petitioner as "self-defeating" and  "mentally ill."  (Dkt. 111, Attach. at 90, 91.)  The Court does not find such an approach was more likely to have achieved success than the strategy trial counsel actually employed.

1    The trial court denied Petitioner's claim that counsel was ineffective at sentencing.

2    (M.E. 6/21/96.)  In support of this claim, Petitioner has submitted additional factual materials

3    that were not presented to the state court.  Despite Petitioner's failure to develop these facts

4    in state court, the Court has considered these materials and concludes that the trial court's

5    denial of Petitioner's sentencing-stage IAC claim was not an unreasonable application of

6    clearly established federal law as set forth in <u>Strickland</u>.  Petitioner is not entitled to relief

7    on Claim P.

8    **Claim R:     The Arizona Supreme Court's failure to conduct a proper proportionality**

9    **              review violated Petitioner's right to due process.**

10   Petitioner argues that the proportionality review conducted in his case "fell below the

11   most minimal standards of due process – without reliable sources of information, without

12   standards, without rules, and without notice of the issues, and even without the personal

13   participation of the Justices who were supposed to be conducting it."  (Dkt. 82 at 91.)

14   Petitioner raised this claim in his PCR petition (ROA-PCR 245 at 13-14), and the court PCR

15   court denied it as procedurally precluded (M.E. 3/27/96).

16   There is no federal constitutional right to proportionality review of a death sentence.

17   <u>McCleskey v. Kemp</u>, 481 U.S. 279, 306 (1987) (citing <u>Pulley v. Harris</u>, 465 U.S. 37, 43-44

18   (1984)).  Nevertheless, at the time of Petitioner's direct appeal, it was the stated practice of

19   the Arizona Supreme Court to undertake a proportionality review of all capital sentences,[30]

20   and the court did so with respect to Petitioner's sentence:

21           After considering the defendant's claims of error, we make an
22       independent review to determine whether the death penalty is excessive or
         disproportionate to the penalty imposed in similar cases.  <u>Richmond</u>, 136 Ariz.
23       at 321, 666 P.2d at 66.  We compare the defendant and his crime to those cases
         where the death penalty was properly imposed because the crime was
24       committed in a manner raising it above "the norm" of first degree murders, or
         the defendant's background places him above "the norm" of first degree
25       murderers.  <u>State v. Blazak</u>, 131 Ariz. 598, 604, 643 P.2d 694, 700, cert.

26   

27       [30]     The state court discontinued proportionality reviews in 1992.  <u>State v. Salazar</u>,
     173 Ariz. 399, 417, 844 P.2d 566, 584 (1992).

28

denied, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982).  We also compare the defendant and his crime to those cases where we have lessened the penalty imposed to life imprisonment. State v. McCall, 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), cert. denied, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).

There are numerous instances where we have upheld the imposition of the death penalty when the murder was committed for pecuniary gain.  State v. LaGrand, 152 Ariz. 483, 733 P.2d 1066, cert. denied, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); State v. Harding, 141 Ariz. 492, 687 P.2d 1247 (1984); State v. Blazak, 131 Ariz. 598, 643 P.2d 694, cert. denied, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982); State v. Tison, 129 Ariz. 526, 633 P.2d 335 (1981), cert. denied, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982).  We have also upheld the death penalty in cases where the defendant had prior convictions punishable by life imprisonment.  State v. Arnett, 158 Ariz. 15, 760 P.2d 1064 (1988); State v. Castaneda, 150 Ariz. 382, 724 P.2d 1 (1986); State v. Bracy, 145 Ariz. 520, 703 P.2d 464 (1985), cert. denied, 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986); State v. Harding, 141 Ariz. 492, 687 P.2d 1247 (1984).

In contrast, we have reduced a defendant's death penalty sentence to life imprisonment where we have found insufficient evidence to support the aggravating circumstances.  State v. Johnson, 147 Ariz. 395, 710 P.2d 1050 (1985).  We have also reduced the defendant's sentence where the defendant was mentally impaired, State v. Graham, 135 Ariz. 209, 660 P.2d 460 (1983), or very young when he committed the crime.  State v. Valencia, 132 Ariz. 248, 645 P.2d 239 (1982).

Nothing in the present case leads us to consider that death is a disproportionate punishment.  The defendant does not fall within any of the cases where we have reduced the death penalty to life imprisonment.  We find nothing in the record otherwise making his sentence disproportionate.  The defendant does, however, fall within those cases where the death sentence was properly imposed.  Thus, the imposition of the death penalty is justified.

Schad III, 163 Ariz. 422-23, 788 P.2d at 1173-74.

While conceding that there is no constitutional right to proportionality review, Petitioner argues that the Arizona Supreme Court, by instituting the practice of reviewing the proportionality of death sentences, must carry out the practice in accord with the Due Process Clause by providing notice, an opportunity to be heard, and objective guidelines.  (Dkt. 82 at 91-93.)

The Ninth Circuit rejected this argument in Ceja v. Stewart, 97 F.3d 1246, 1252 (9th Cir. 1996).  In Ceja, the petitioner argued that the Arizona Supreme Court had created a liberty interest in proportionality review, which the court violated when it failed to undertake

- 68 -

such a review of his death sentence. Id.  The Ninth Circuit denied the claim, holding that the interest implicated by proportionality review – the "substantive right to be free from a disproportionate sentence" – was   protected by the application of "adequately narrowed aggravating circumstance[s]." Id.  In the present case, in contrast to Ceja, the supreme court did conduct a proportionality review, in addition to applying Arizona's properly narrowed statutory aggravating factors.

Petitioner has not shown that the supreme court carried out its proportionality analysis in bad faith.  See Walton v. Arizona, 497 U.S. 639, 655-56 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584 (2002) (if a proportionality review was conducted in good faith, the Constitution does not require a federal court to look behind the state court's conclusion).  It is not a proper function of this Court to review a state court's decision on proportionality.  Lewis v. Jeffers, 497 U.S. at 779 (court of appeals erred in conducting a de novo, case-by-case comparison of state cases); see also LaGrand, 133 F.3d at 1263; Gerlaugh, 129 F.3d at 1044-45; Martinez-Villareal v. Lewis, 80 F.3d 1301, 1308-09 (9th Cir. 1996).  Petitioner is not entitled to relief on Claim R.

**Claim U:    Inadequate standard for weighing aggravating and mitigating standards.**

In its procedural status order the Court indicated that it would consider the merits of the following properly exhausted allegation of Claim U: that Arizona's death penalty statute and case law fail to establish an objective standard to guide the discretion of the sentencing judge in weighing aggravating and mitigating factors and determining whether to impose a sentence of death.  (Dkt. 59 at 16-17.)  Petitioner's brief fails to address this claim (see Dkt. 82), and the Court finds it meritless.

The Arizona Supreme Court addressed and rejected this claim on direct appeal.  Schad III, 163 Ariz. at 422, 788 P.2d at 1173. This decision was neither contrary to nor an unreasonable application of clearly established federal law.  Courts have consistently upheld the validity of Arizona's death penalty scheme.  See Lewis v. Jeffers, 497 U.S. at 774-77;

Walton v. Arizona, 497 U.S. at 649-56; Smith v. Stewart, 140 F.3d 1263, 1272 (9th Cir. 1998); Woratzeck v. Stewart, 97 F.3d at 335; Chaney v. Lewis, 801 F.2d 1191, 1195 (9th Cir. 1986).  Petitioner is not entitled to relief on Claim U.

**Claim AA:   Ineffectiveness of appellate counsel.**

Petitioner alleges that appellate counsel was ineffective in violation of Petitioner's rights under the Sixth and Fourteenth Amendments. (Dkt. 82 at 95-106.) Without addressing Petitioner's specific allegations of appellate counsel's IAC, the PCR court denied this claim, finding that counsel's decision not to raise certain issues on appeal was "strategic" and that Petitioner had failed to show that counsel's performance was either deficient or prejudicial. (M.E. 6/21/96 at 2.)

The Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 396 (1985). A claim of ineffective assistance of appellate counsel is reviewed according to the standard set out in Strickland.   See Miller v. Keeney, 882 F.2d 1428, 1433-34 (9th Cir. 1989). Under Strickland, Petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, Petitioner would have prevailed on appeal.  Smith v. Robbins, 528 U.S. 259, 285-86 (2000); see Miller, 882 F.2d at 1434 n.9 (citing Strickland, 466 U.S. at 688, 694).

"A failure to raise untenable issues on appeal does not fall below the Strickland standard."  Turner v. Calderon, 281 F.3d 851, 872 (9th Cir. 2002); see also Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel could not be found to have rendered ineffective assistance for failing to raise issues that "are without merit"); Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985).  Moreover, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a petitioner.  Miller, 882 F.2d at 1434 n.10 (citing Jones v. Barnes, 463 U.S. 745, 751-54 (1983)); see Smith v.

1    Stewart, 140 F.3d at 1274 n. 4 (counsel not required to file "kitchen-sink briefs" because

2    doing so "is not necessary, and is not even particularly good appellate advocacy").  Courts

3    have frequently observed, as the PCR court did here (M.E. 6/26/96 at 2), that the "weeding

4    out of weaker issues is . . . one of the hallmarks of effective appellate advocacy."  Miller, 882

5    F.2d at 1434; see Smith v. Murray, 477 U.S. 527, 536 (1986).  Therefore, even if appellate

6    counsel declines to raise weak issues, counsel will likely remain above an objective standard

7    of competence and will have caused no prejudice.  Id.

8        In addition to satisfying both prongs of the Strickland standard, under the AEDPA

9    Petitioner must make the additional showing that the PCR court's denial of his claims of

10   ineffective assistance of appellate counsel was contrary to or an unreasonable application of

11   clearly established federal law.  28 U.S.C. § 2254(d)(1).

12       On direct appeal, appellate counsel raised thirteen issues.  (Appellant's Opening

13   Brief.)  In his merits brief, Petitioner claims that "appellate counsel failed to provide . . .

14   vigorous and effective advocacy in five areas."  (Id. at 96.)  Applying the principles

15   discussed above, the Court concludes that the underlying claims lack merit and therefore the

16   Court rejects Petitioner's contention that appellate counsel's failure to raise the issues that

17   follow constituted IAC.

18       **1.    Right to present a defense.**

19       As discussed above, trial counsel moved for the appointment of Dr. Bendheim to

20   perform a "psychiatric autopsy" of Mr. Grove.  (ROA-PCR 156.)  The trial court denied the

21   motion.  (M.E. 6/14/85.)  Counsel also sought to introduce Mr. Grove's medical records.

22   (RT 6/27/85 at 1320-21.)  The trial court granted the state's motion to exclude the records.

23   (Id. at 1323-24.)  Appellate counsel did not challenge these rulings on direct appeal.

24       To satisfy the prejudice prong of Strickland, Petitioner must show that if appellate

25   counsel had challenged the trial court's ruling with respect to evidence of the victim's mental

26   health, there was a reasonable probability that he would have prevailed on appeal.  Miller,

27

28
                              - 71 -

883 F.2d at 1433-34.  Petitioner cannot satisfy this burden, because the Arizona Supreme Court has ruled that the type of information trial counsel sought to put before the jury is not admissible.  In State v. Montijo, 160 Ariz. 576, 577-78, 774 P.2d 1366, 1367-68 (1989), the defendant, convicted of negligent homicide, argued on appeal that the trial court erred in precluding expert testimony regarding a "psychiatric autopsy" of the victim, which the defendant had sought to introduce to support his theory that he had acted in self-defense.[31] The supreme court upheld the trial court's ruling on the grounds that "the proposed testimony was not a proper subject of expert testimony." Id. at 580, 774 P.2d at 1370.  The court noted that its precedent "distinguished between general information about a character or behavioral trait and a particularized opinion about how that trait was manifested in the case at trial." Id. The court then explained that "[t]he psychiatric autopsy in this case far transgressed this line. It sought to inform the trier not only about decedent's character *but what decedent did and why he did it on the night of his death*.  It was properly rejected." Id. (emphasis added).

The information trial counsel sought to introduce at Petitioner's trial through Dr. Bendheim's research and testimony similarly constituted an effort to show what Mr. Grove did at the moment of his death – committed suicide – and why he did it.  The information was not admissible under Arizona Supreme Court precedent.  Therefore, the trial court's decision to exclude the evidence was correct, and appellate counsel's decision not to raise a meritless issue on appeal cannot form the basis for a claim of IAC.

Petitioner relies on Beaver v. Hambry, 587 F.Supp. 88 (M.D.Tenn. 1983), to support his argument that psychiatric autopsies are admissible and therefore appellate counsel was deficient for failing to appeal the trial court's rulings to the contrary. (Dkts. 82 at 98, 98 at 76.)  In Beaver, however, the district court did nothing more than offer a brief allusion to the fact that at trial the defense presented testimony by an expert who had performed a

---

[31]    This "autopsy" report purported to show that the victim was a violent, troubled, sexually aggressive substance abuser with a low IQ, "the type of person who dies prematurely by provoking his own death." Montijo, 160 Ariz. at 579, 774 P.2d at 1369.

psychiatric autopsy of the victim; because such evidence had been placed before the jury, the district court rejected the habeas petitioner's challenge to the trial court's exclusion of additional evidence concerning the victim's state of mind.  587 at 91.  The district court did not consider, let alone endorse, the propriety of admitting the results of a psychiatric autopsy. Its holding does nothing to advance Petitioner's IAC claim.

### 2.    Removal of jurors.

The trial court, sua sponte, excused six jurors on the grounds that they were hearing-impaired.  (RT 6/18/85 at 84-85, 92, 94, 108-09.)  Petitioner argues that the court did not make further inquiries or pursue alternate means of accommodating the jurors. (Dkt. 82 at 100-01.)  The court also dismissed a juror, Larry Reed, after learning that his siblings had experienced legal troubles.  (RT 6/19/85 at 210.)  The court interviewed Mr. Reed, who indicated that, based upon the unfair manner in which the authorities had treated his relatives, he would "probably go for the defendant" and would "go one sided."  (Id. at 209.)  Petitioner argues that the court's "summary" removal of Mr. Reed "denied Petitioner the opportunity to inquire into what Mr. Reed's statements actually meant."  (Dkt. 82 at 101.)  Trial counsel did not object to the court's dismissal of these jurors, and he approved of the panel at the conclusion of voir dire.  (RT 6/19/85 at 218.)

Petitioner contends that the court's dismissal of these jurors violated his right to a jury composed of a fair cross-section of the community and his right to a fair and impartial jury, and that appellate counsel's failure to raise the issue on appeal constituted IAC. (Dkt. 82 at 102.)

A review of the Arizona Supreme Court's holdings in this area indicates that appellate counsel did not perform ineffectively by failing to pursue this issue on appeal.  The supreme court has held that while a defendant is entitled to a fair and impartial jury, "he is not entitled to be tried by any particular jury; therefore, unless the record affirmatively shows that such a fair and impartial jury was not secured, the conviction must be affirmed."  State v. Arnett,

119 Ariz. 38, 50, 579 P.2d 542, 554 (1978); <u>see</u> <u>State v. Doerr</u>, 193 Ariz. 56, 65, 969 P.2d 1168, 1177 (1998).  In <u>Arnett</u>, the court further explained that "the matter of excusing jurors is committed to the sound discretion of the trial judge, and in the absence of a clear and prejudicial abuse of that discretion, his action will not be disturbed on appeal; this is so even where the judge acts on his own motion." <u>Id.</u>; <u>see</u> <u>State v. Dickens</u>, 187 Ariz. 1, 15, 926 P.2d 468, 482 (1996).  Finally, the <u>Arnett</u> court noted that "appellant waived any objection in this regard, both by failing to object at the time of the excusal, and by expressly approving the panel at the conclusion of voir dire." <u>Id.</u> (citations omitted); <u>see</u> <u>State v. Milke</u>, 177 Ariz. 118, 122, 865 P.2d 779, 783 (1993).

Nothing in the record affirmatively shows that Petitioner was denied a fair and impartial jury or that the trial court clearly and prejudicially abused its discretion in excusing the jurors.  These facts, together with counsel's waiver of any objections, render untenable any argument that Petitioner's rights were violated by the trial court's dismissal of the jurors.  Because appellate counsel is not obligated to raise untenable issues, his failure to do so here does not constitute IAC.

### 3.   Jury instructions.

Petitioner claims that counsel erred by failing to raise as an appellate issue an alleged error in the jury instructions.  (Dkt. 82 at 102-03.)  The trial court instructed the jury that the malice element of murder could be inferred from the use of a deadly weapon; the court did not provide a definition of "deadly weapon."[32]  (RT 6/27/85 at 1403-04.)  Defense counsel

[32]   The court instructed the jury, in relevant part:

Murder is the unlawful killing of a human being with malice. The thing that distinguishes murder from all other killings is malice. There are two kinds of malice. A person has one kind of malice when he deliberately intends to kill. If you determine that the defendant used a deadly weapon in the killing, you may find malice. If you determine that the defendant had no considerable provocation for the killing, you may find malice.

did not object to this portion of the instruction. (RT 6/27/85 at 1338.) According to Petitioner, the failure to provide a definition of "deadly weapon" was an error that violated his right to due process, a fair trial, and a reliable sentencing determination. (Dkt. 82 at 102.) The Court disagrees.

First, it is noted that the instruction provided by the trial court comported with the murder instruction approved on numerous occasions by the Arizona Supreme Court. See, e.g., State v. Bishop, 144 Ariz. 521, 522-23, 698 P.2d 1240, 1241-42 (1985); State v. Lujan, 124 Ariz. 365, 370-71, 604 P.2d 629, 634-34 (1979).

Moreover, because defense counsel did not object at trial, the issue was waived on appeal unless the court's failure to define "deadly weapon" constituted fundamental error. State v. Valles, 162 Ariz. 1, 6, 780 P.2d 1049, 1054 (1989); see State v. Zaragoza, 135 Ariz. 63, 66, 659 P.2d 22, 25 (1983) (noting that convictions are rarely overturned on the basis of an improper instruction to which no objection was made at trial) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). In Valles, the Arizona Supreme Court explained that "a court need not define every phrase or word used in the instructions" and that "[w]hen the words are used in their ordinary sense and are commonly understood by those familiar with the English language, the court need not define those terms." Id. The court then found that "deadly weapon" was a term with a commonly understood meaning, noting that "the statutory definition of deadly weapon and the common definition are essentially the same." Id. at 6-7, 780 P.2d at 1054-55. The supreme court concluded, therefore, that the trial court's failure to define "deadly weapon" in its jury instructions did not constitute fundamental error. Id.

Appellant had no duty to raise a meritless challenge to the murder instruction on direct appeal; therefore, his failure to do so did not constitute IAC.

---

(RT 6/27/85 at 1403.)

1
        **4.      Right to be present.**

2        Petitioner claims that counsel was ineffective for failing to raise as an appellate issue

3   the fact that Petitioner was not present when defense counsel moved for a mistrial during an

4   in-chambers meeting and when the court and counsel settled the jury instructions.  (Dkt. 82

5   at 103-04.)

6        "[A] defendant is guaranteed the right to be present at any stage of the criminal

7   proceeding that is critical to its outcome if his presence would contribute to the fairness of

8   the procedure."  Kentucky v. Stincer, 482 U.S. 730, 745 (1987).  As the Arizona Supreme

9   Court explained, however, a defendant's right to be present extends "only to those

10  proceedings in open court 'whenever his presence has a relation, reasonably substantial, to

11  the fullness of his opportunity to defend against the charge.'"  State v. Christensen, 129 Ariz.

12  32, 38, 628 P.2d 580, 586 (1981) (citation omitted); see State v. Dann, 205 Ariz. 557, 571,

13  74 P.3d 231, 245 (2003) (noting that "the right does not extend to in-chambers pretrial

14  conferences . . . and various other conferences characterized as relating only to the resolution

15  of questions of law") (citation omitted).

16       At defense counsel's request, an in-chambers conference occurred on the morning of

17  June 21, 1985, prior to the day's trial proceedings.  At the meeting, defense counsel, citing

18  improprieties in a previous witness's testimony, moved for a mistrial and raised several other

19  evidentiary issues.  (RT 6/21/85 at 612-23.)  Counsel waived Petitioner's presence.  (Id. at

20  623.)

21       Petitioner argues that counsel could not validly waive Petitioner's right to be present

22  at the meeting.  (Dkts. 82 at 103-04, 98 at 82.)  The Court disagrees.  In State v. Collins, 133

23  Ariz. 20, 23, 648 P.2d 135, 138 (1982), the Arizona Supreme Court held that counsel may

24  waive a defendant's right to be present at trial proceedings, even those involving issues that

25  are not "wholly legal" in nature, and that "the trial court may rely on counsel's waiver

26  without requiring personal waiver by the defendant."  The Court also finds that the

27

28
                                    - 76 -

1    proceeding involved the resolution of purely legal matters and therefore did not affect

2    Petitioner's right to be present.

3         On June 27, 1985, the court and counsel gathered outside of Petitioner's presence "to

4    make a record . . . on the [jury] instructions." (RT 6/27/85 at 1335.)  Defense counsel did

5    not comment on or object to Petitioner's absence during the brief meeting.  (Id. at 1335-44.)

6         The Court finds that this proceeding also involved wholly legal matters.  At the brief

7    meeting, the judge informed counsel which instructions he would read to the jury and counsel

8    made a record of their objections.  (Id.)  Petitioner "could have contributed nothing" to this

9    legal discussion and cannot show "that his presence would have made any difference."  State

10   v. Schackart, 190 Ariz. 238, 255, 947 P.2d 315, 332 (1997); see Stincer, 482 U.S. at 745.

11   Therefore, Petitioner's absence from the meeting did not constitute a violation of his

12   constitutional rights.

13        The argument that Petitioner's right to be present was violated in these instances is

14   without merit.  Appellate counsel's failure to raise the issue did not constitute IAC.

15        **5.      Cruel and unusual punishment.**

16        Petitioner contends that appellate counsel was ineffective because he failed to argue

17   that Petitioner's death sentence constituted cruel and unusual punishment. (Dkt. 82 at 105-

18   06.)  As the basis for this proposed argument, Petitioner cites the lack of evidence of his guilt

19   and the strength of the evidence in mitigation.  (Id.)

20        This claim is without merit.  On direct appeal, counsel raised eleven separate claims

21   attacking Petitioner's death sentence.  (Appellant's Opening Brief.)  These included a

22   challenge to the trial court's findings in aggravation and mitigation (id. at 22-34) and claims

23   that Arizona's death penalty scheme constitutes cruel and unusual punishment in violation

24   of the Eighth Amendment (id. at 35-38, 55).  The Arizona Supreme Court rejected these

25   claims.  Schad III, 163 Ariz. at 417- 23, 982 P.2d at 1168-74.

26

27        Petitioner has failed to demonstrate that appellate counsel was ineffective for failing

28

to raise an additional challenge to Petitioner's sentence on the grounds that his conviction was supported by insufficient evidence, especially given the fact that the Arizona Supreme Court had already held that the evidence was sufficient to support a murder conviction. Schad I, 129 Ariz. at 572, 633 P.2d at 381; see Schad III, 163 Ariz. at 420-21, 982 P.2d at 1171-72 (discussing sufficiency of evidence supporting the pecuniary gain aggravating factor).

The Court concludes that Petitioner has not shown that the performance of appellate counsel was either deficient or prejudicial. Therefore, the PCR court's denial of Petitioner's claim of appellate counsel IAC was neither contrary to nor an unreasonable application of federal law. Petitioner is not entitled to relief on Claim AA.

## EVIDENTIARY DEVELOPMENT

### 1. Background.

Petitioner seeks to present, through an evidentiary hearing and the introduction of various affidavits, evidence that was not considered by the state court. Petitioner requests an evidentiary hearing with respect to Claims A, I, J, P, R, and AA.[33] (See Dkt. 82.) As noted above, Petitioner also filed a motion seeking to expand the record, attached to which was Dr. Stanislaw's affidavit. (Dkt. 115.) In addition, Petitioner's merits brief and reply include affidavits containing factual material that was not presented to the state court. (Dkts. 82, 98.) Petitioner contends that he is entitled to an evidentiary hearing and to the consideration of the new materials because he pursued the factual basis of the relevant claims through the exercise of due diligence in state court. The Court disagrees.

In evaluating Petitioner's requests, the Court must apply the relevant provisions of 28 U.S.C. § 2254(e)(2):

If the applicant has failed to develop the factual basis of a claim in State court

---

[33] The Court has already addressed and denied Petitioner's request for an evidentiary hearing with respect to Claim B. Supra, pp. 19-21.

proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

.    .    .

  (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.[34]

Section 2254(e)(2) similarly limits a petitioner's ability to present new evidence through a motion to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases.[35] See Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the conditions of § 2254(e)(2) generally apply to petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing) (citing Holland v. Jackson, 542 U.S. 649, 652-53 (2004) (per curiam)).

As interpreted by the United States Supreme Court, the restrictions of subsection (e)(2) apply only if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000). "The purpose of the fault component of 'failed' is to ensure the prisoner undertakes his own diligent search for evidence." Id. at 435. The Court found that this rule served the AEDPA's goal of furthering comity in that "federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner

---

[34]  Petitioner does not argue, pursuant to § 2254(e)(2)(A)(i), that a new retroactive rule of constitutional law applies to his claims.

[35]  Rule 7 authorizes a federal habeas court to expand the record to include additional material relevant to the determination of the merits of a petitioner's claims. "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath, to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record." Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

made insufficient effort to pursue in state proceedings." <u>Id.</u>; <u>see also</u> <u>Cardwell v. Netherland</u>, 971 F. Supp. 997, 1008 (E.D. Va. 1997) ("Ordinarily, a § 2254 petition is limited to the factual record developed in state court proceedings"), <u>aff'd</u> <u>Cardwell v. Greene</u>, 152 F.3d 331 (4th Cir. 1998), <u>overruled on other grounds</u>, <u>Bell v. Jarvis</u>, 236 F.3d 149 (4th Cir. 2000). Thus, subsection (e)(2) allows factual development when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." <u>Williams</u>, 529 U.S. at 432; <u>see</u> <u>Baja v. Ducharme</u>, 187 F.3d 1075, 1078-79 (9th Cir. 1999).

In compliance with § 2254(e)(2), when the factual basis for a particular claim has not been fully developed in state court, the first question for a district court in evaluating whether to grant an evidentiary hearing is whether the petitioner was diligent in attempting to develop its factual basis. <u>See</u> <u>Baja</u>, 187 F.3d at 1078 (quoting <u>Cardwell</u>, 152 F.3d at 337). The Supreme Court has set an objective standard for determining "diligence": whether the petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." <u>Williams</u>, 529 U.S. at 435. For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney "fails" to develop the factual record if he does not make reasonable efforts to investigate and present the evidence to the state court. <u>See</u> <u>id.</u> at 438-40 (counsel lacked diligence because he was on notice of possibly material evidence and conducted only a cursory investigation); <u>Alley v. Bell</u>, 307 F.3d 380, 390-91 (6th Cir. 2002) (lack of diligence because petitioner knew of and raised claims of judicial bias and jury irregularities in state court, but failed to investigate all the factual grounds for such claims).

Absent unusual circumstances, diligence requires "that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." <u>Williams</u>, 529 U.S. at 437; <u>see</u> <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1090 (9th Cir. 2001), <u>amended on</u>

denial of reh'g, 253 F.3d 1150 (9th Cir. 2001) ("inactions show[ed] insufficient diligence" on ineffective counsel claim where petitioner did not request an evidentiary hearing and brought claim only on appeal rather than in a collateral proceeding).  However, the mere request for an evidentiary hearing may not be sufficient to establish diligence if a reasonable person would have taken additional steps.  See Dowthitt v. Johnson, 230 F.3d 733, 758 (5th Cir. 2000) (petitioner requested hearing but was not diligent because he failed to present affidavits of family members that were easily obtained without court order and with minimal expense); see also Koste v. Dormire, 345 F.3d 974, 985-86 (8th Cir. 2003) (lack of diligence despite hearing request because petitioner made no effort to develop the record or assert any facts to support claim that his counsel was ineffective for knowing of and failing to investigate his psychiatric condition), cert. denied, 541 U.S. 1011 (2004).  If an evidentiary hearing is requested, a petitioner's inability to persuade a state court to conduct such a hearing does not in itself demonstrate lack of diligence.  See Cardwell, 152 F.3d at 338.

If the Court determines that Petitioner has not been diligent in establishing the factual basis for his claims in state court, the Court may not conduct a hearing unless Petitioner satisfies one of the narrow exceptions set forth in § 2254(e)(2).  These exceptions do not apply to Petitioner's claims; Petitioner does not argue that the factual predicate of the claims could not have been previously discovered or that the facts underlying the claims are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no rational factfinder would have found him guilty.  Therefore, if Petitioner cannot show that he pursued the claims with due diligence in state court, he is not entitled to a hearing or to expansion of the record.

Finally, with respect to claims that were diligently developed in state court, and which are not subject to the strictures of § 2254(e)(2), a petitioner is entitled to an evidentiary hearing on a claim where the facts are in dispute if he has alleged facts that, if proven, would entitle him to relief, and he did not receive a full and fair evidentiary hearing in state court.

1  <u>Silva v. Woodford</u>, 279 F.3d at 853.

2  The Court has previously described the history of Petitioner's collateral attack on his

3  conviction in state court.  <u>See</u> <u>supra</u> at pp. 54-57.  Based upon that record, the Court

4  concludes that Petitioner was not diligent in developing the factual bases of his claims,

5  despite being afforded an opportunity to do so during collateral proceedings that stretched

6  over a period of nearly five years.

7  **2.      Motions discussion.**

8  Applying the principles discussed above, the Court evaluates Petitioner's requests for

9  an evidentiary hearing and expansion of the record.

10  <u>Claims A and I:</u>  In his supplemental PCR petition, Petitioner argued that newly

11  discovered evidence, in the form of an affidavit by Duncan's ex-wife, supported his

12  contention that Duncan was acting as an agent of the police when he spoke with Petitioner.

13  (ROA-PCR 319, Ex. 2.)  The Court has resolved this aspect of Claim A by determining that

14  Petitioner's right to counsel had not attached; therefore, additional evidence regarding

15  Duncan's alleged status as a police agent is not relevant.

16  With respect to the remainder of Claim A and Claim I, alleging a <u>Brady</u> violation and

17  prosecutorial misconduct, Petitioner seeks an evidentiary hearing "at which [he] can discover

18  and present all the undisclosed incentives provided by the prosecution to Duncan." (Dkt. 82

19  at 38.) Petitioner did nothing to develop the factual predicate of this claim in state court.  He

20  did not raise this claim on direct appeal, and his PCR petitions do not include an allegation

21  that the State failed to disclose impeachment materials regarding Duncan.   Therefore,

22  Petitioner did not exercise due diligence in developing the claim in state court, and he is

23  precluded from obtaining an evidentiary hearing before this Court.

24  <u>Claim J:</u>  Claim J alleges two areas of IAC by trial counsel: (1) failure to locate

25  Duncan's wife and (2) failure to move for reconsideration of the court's refusal to appoint

26  Dr. Bendheim to examine the victim's mental health, along with a failure to make a proper

27

28

proffer of the victim's medical records.  (Dkt. 82 at 38-50.)

In his preliminary PCR petition, Petitioner raised the issue of ineffectiveness with respect to Dr. Bendheim's appointment and the victim's medical records.  (ROA-PCR 245 at 9-10.)  He sought an evidentiary hearing, but presented no affidavits or other information in support of the factual basis of the claim.  (Id.)  In his supplemental PCR petition, he argued that trial counsel was ineffective for failing to locate Duncan's ex-wife (ROA-PCR 319 at 9-10); he moved for an evidentiary hearing and presented an affidavit from Sprayberry (id., Ex. 2).  In a supplemental filing he included an affidavit from his investigator indicating that she had been able to locate Sprayberry with no difficulty.  (ROA-PCR 337.)  Finally, to supplement his motion for rehearing, Petitioner presented an affidavit from trial counsel, who indicated that he had been unable to locate Sprayberry and that his failure to call her as a witness was not a strategic decision.  (ROA-PCR 344.)  The state court considered this information and rejected it as a basis for a claim of IAC.  (M.E. 6/21/96 at 2.)

Petitioner has not offered additional information to support this aspect of Claim J. Therefore, based upon this record, even a finding that Petitioner was diligent in developing the factual predicate of the claim would not entitle him to an evidentiary hearing.  To the extent that there is a dispute regarding any issue relevant to trial counsel's performance, the Court has already determined that Petitioner has not demonstrated prejudice under Strickland; therefore, he has not alleged facts that, if true, would entitle him to relief.  Silva, 279 F.3d at 853.  See supra, pp. 27-28.

In support of the second contention in Claim J, Petitioner has attached to his reply brief an affidavit by Dr. George Woods, who attests that the psychiatric autopsy is a valuable and accepted forensic technique and opines that such a procedure, if performed by Dr. Bendheim, would have supported the theory that the victim had committed suicide.  (Dkt. 98, Ex. C.)  Petitioner's failure to develop this type of information in the state court proceedings precludes this Court from granting him an evidentiary hearing on this aspect of Claim J.  The

Court further observes that the information contained in the affidavit, which dates from June 2001, is at best tangentially relevant to the issue of whether counsel performed in an objectively unreasonable and prejudicial manner when he failed to persuade the trial court to appoint Dr. Bendheim for the purpose of performing a psychiatric autopsy of Mr. Grove. See supra, pp. 29-31.

Claim P:  Petitioner seeks an evidentiary hearing on his claim of IAC at sentencing. (Dkt. 82 at 91.)  Petitioner supports his request for a hearing, and the merits of Claim P, with the new factual material already outlined by the Court, which includes information obtained from Petitioner's relatives (Dkt. 82, Exs. 4, 5), the medical records of Petitioner's father (id., Ex. 13), and affidavits filed by Drs. Lebowitz (Dkt. 98, Ex. K) and Stanislaw (Dkt.111, Attach.).  Petitioner asserts that he did not fail to develop this evidence in state court and that he has alleged facts that, if true, entitle him to relief.  (Dkt. 82 at 91.)  The Court disagrees.

Petitioner knew the factual basis for his claims at the time of the extensive PCR proceedings.  He has not shown that the evidence he now presents was not available during that period.  Petitioner contends, however, that any inadequacies in his effort to develop a record before the state court were not attributable to a lack of diligence on his part.  Instead, Petitioner alleges that "[PCR] counsel requested time, funds, and a hearing at which to investigate, develop and present this evidence" but "were denied all of that." (Dkt. 98 at 70.)  As the Court has previously recounted, PCR counsel requested and were granted thirty-four motions to extend, resulting in a delay of nearly four years between the filing of the preliminary PCR petition and the supplement.  This fact sufficiently addresses the contention that the trial court denied Petitioner's request for time to develop his claims.[36]

Petitioner does not indicate which request for funding the trial court denied and how

---

[36]    Petitioner complains that "chaos" resulted from the fact that he was represented by multiple attorneys during the PCR proceedings.  (Dkt. 119 at 6.)  However, Ms. Repp alone had twenty-one months, during which she moved for and was granted seventeen continuances, to file a supplemental petition.

such a denial impeded his ability to develop his claims.[37]  To the contrary, the record demonstrates that the state court facilitated Petitioner's investigation and development of evidence supporting his claims.  PCR counsel successfully moved for the appointment of an investigator and a mitigation specialist. (ROA-PCR 264, 309.)  The investigator had been working on the case for more than two years prior to the filing of the supplemental PCR petition.  While it is true that the mitigation specialist was appointed on July 6, 1995, only three months before the filing of the supplemental petition, Ms. Repp had been assigned to the case for well over a year before she moved for Ms. Wake's appointment in March 1995. (ROA-PCR 301-2.) Moreover, by the time Ms. Wake filed her supplemental affidavit of July 7, 1996, she had been working on Petitioner's behalf for more than a year, but she was still unable to offer more than conclusory claims regarding the existence of additional, unspecified, mitigation evidence.  (ROA-PCR 342.)

The trial court denied Petitioner's claims without holding an evidentiary hearing as requested by Petitioner.  (M.E. 6/21/96, 7/24/96.)  The Court finds, however, that the state court's refusal to hold an evidentiary hearing was attributable to Petitioner's failure to develop the factual record.  See Koste, 345 F.3d at 986.  A reasonable attorney, provided with the time and funding to which PCR counsel had access, would have presented affidavits and records in support of the argument that Petitioner's traumatic family background was not adequately explored by trial counsel.  See Dowthitt, 230 F.2d at 757.  With nothing before it but Ms. Wake's affidavits and their allusions to additional mitigating information, the trial court was not unreasonable in denying the claim without holding an evidentiary hearing.

Because Petitioner did not "undertake[] his own diligent search for evidence" in state court, Williams, 529 U.S. at 435, he is not entitled to an evidentiary hearing.  Based upon the

---

[37]   The only motions denied were for contact visits between Ms. Wake and Petitioner (M.E. 11/20/95) and the request for disclosure of Petitioner's DOC file (M.E. 12/27/95).  Although the former motion was denied, Ms. Wake indicated that she interviewed Petitioner twice.  (ROA-PCR 319, Ex. 3 at 2.)

same analysis, the Court again denies Petitioner's motion to expand the record.  See Holland v. Jackson, 542 U.S. at 652-53.

Claim R:  Petitioner asserts that "he is entitled to an evidentiary hearing where he can further develop the facts on the 'process' the Arizona Supreme Court used to conduct this [i.e., proportionality] review generally, and specifically in this case."  (Dkt. 82 at 95.) Petitioner raised the claim of constitutionally inadequate proportionality review in his preliminary PCR petition (ROA-PCR at 13-16), but did nothing to develop the claim in state court.  Moreover, as the Court noted in its Order denying discovery of documents related to this Claim (Dkt. 75 at 7) and discussed with respect to Claim R, such information is not relevant to the Court's evaluation of the supreme court's proportionality review.  Petitioner is not entitled to an evidentiary hearing on this issue.

Claim AA:  Petitioner raised the issue of ineffective appellate counsel in his preliminary PCR petition.  (ROA-PCR at 16-17.)  The claim consisted of the conclusory assertion that "Petitioner's appellate counsel failed, inter alia, to raise the claims set forth in this petition."  (Id. at 16.)

As discussed above, a claim of appellate IAC requires a showing that counsel's failure to raise certain issues on appeal fell below professional norms of performance and was therefore constitutionally deficient.  Petitioner did not attempt to make such a showing in state court.  He did not, for example, investigate the basis of appellate counsel's decision not to raise the issues which form the basis of this claim.  Petitioner's lack of diligence in state court prohibits the Court from holding an evidentiary hearing.

**CONCLUSION**

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.  The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 27) is **DENIED WITH PREJUDICE.**   The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 28th day of September, 2006.

_____
Roslyn O. Silver
United States District Judge